1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

11  JENNIFER TRAYERS,                          Civil No.     15cv0924-H (BLM)

12                          Petitioner,        **REPORT AND RECOMMENDATION**
                                               **OF UNITED STATES MAGISTRATE**
13          vs.                                **JUDGE RE DENIAL OF PETITION**
                                               **FOR A WRIT OF HABEAS CORPUS**
14  DEBORAH K. JOHNSON, Warden, et al.,

15                          Respondents.

16

17          This Report and Recommendation is submitted to United States District Judge

18  Marilyn L. Huff pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

19  United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

22          Jennifer Trayers (hereinafter "Petitioner"), is a state prisoner proceeding pro se

23  with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)

24  Petitioner challenges her San Diego County Superior Court conviction for the second

25  degree murder of her husband, for which she was sentenced to 16 years-to-life in state

26  prison.  (Pet. at 1-2.[1])  Petitioner alleges here, as she did in state court, that her federal

27  constitutional rights were violated by the prosecutor's misrepresentation of the law during

28

------

[1] Pleading citations are to pages assigned by the Court's Electronic Case Filing ("ECF") system.

1  closing argument which lowered the burden of proof regarding the provocation needed
2  to reduce murder to manslaughter, and because the state appellate court applied an
3  incorrect standard of review in finding that error to be harmless (claim one), by the
4  admission of irrelevant and prejudicial evidence of Petitioner's extramarital affair (claim
5  two), and because there is insufficient evidence to support a conviction on any crime
6  greater than voluntary manslaughter (claim three).  (Id. at 6-8.)

7       Respondent has filed an Answer and lodged the state court record.  (ECF Nos. 12-
8  13.)  Respondent contends federal habeas relief is not available because: (1) Claim 1 is
9  procedurally defaulted due to defense counsel's failure to object to the prosecutor's
10  argument and request a curative instruction, (2) the state court adjudication of all claims
11  is neither contrary to, nor involves an unreasonable application of, clearly established
12  federal law, and (3) any errors are harmless.  (Ans. at 2-3; Memorandum of P&A in
13  Support of Answer ["Ans. Mem."] at 15-29.)

14       Petitioner has filed a Traverse.  (ECF No. 14.)  She argues that she can show cause
15  and prejudice, or a fundamental miscarriage of justice, to excuse any procedural default,
16  and that the evidence of provocation, in particular the brutality of her attack on her
17  husband, supports a finding of manslaughter only and not murder.  (Traverse at 5-6.)  She
18  also argues that even if the state court is correct that evidence of her affair was relevant,
19  its relevance is outweighed by its prejudice.  (Id. at 6-8.)

20       For the reasons set forth below, the Court finds it unnecessary to reach the
21  procedural default issue.  The Court finds federal habeas relief is unavailable because the
22  adjudication of Petitioner's claims by the state court is neither contrary to, nor involves
23  an unreasonable application of, clearly established federal law, and is not based on an
24  unreasonable determination of the facts in light of the evidence presented in the state
25  court proceedings.  The Court also finds that any errors with respect to Claims 1 and 2
26  are harmless.  The Court therefore **RECOMMENDS** the Petition be **DENIED**.
27  / / /
28  / / /

15cv0924

## II.

## STATE PROCEEDINGS

In a one-count Information filed in the San Diego County Superior Court on March 1, 2011, Petitioner was charged with murder in violation of California Penal Code section 187(a).  (Lodgment No. 2, Clerk's Tr. ["CT"] at 7.)   The information alleged she personally used a deadly weapon, a knife, within the meaning of Penal Code section 12022(b)(1).  (Id. at 8.)  On February 8, 2012, a jury found her guilty of second degree murder, and returned a true finding on the deadly weapon use allegation.  (CT 146.)  On March 9, 2012, she was sentenced to 16 years-to-life in state prison.  (CT 242-43.)

Petitioner appealed, raising the same claims raised here.  (Lodgment Nos. 4-6.) The appellate court affirmed, denying all claims on the merits.  (Lodgment No. 7, People v. Trayers, No. D061564, slip op. (Cal.Ct.App. Jan. 31, 2014).)  Although the appellate court found Petitioner had forfeited Claim 1 by failing to object to the prosecutor's closing argument or request a curative instruction, it addressed the merits of the claim in the exercise of its discretion "to adjudicate an important question of constitutional law." (Id. at 34-35.)  On March 13, 2014, Petitioner filed a petition for review in the state supreme court presenting the same claims.  (Lodgment No. 8.)  That petition was denied by an order which stated: "The petition for review is denied."  (Lodgment No. 9, People v. Trayers, No. S217120, order at 1 (Cal. Apr. 16, 2014).)

## III.

## TRIAL COURT PROCEEDINGS

Dr. Othon Mena, a Deputy Medical Examiner for the County of San Diego, testified that he responded to 3750 Grim Avenue, number two, in San Diego, at 5:33 p.m. on December 6, 2010.  (Lodgment No. 1, Reporter's Tr. ["RT"] at 216-17.)  Dr. Mena observed the body of Dr. Frederick Trayers lying on the bedroom floor face down in the fetal position leaning against a bed.  (RT 217, 225.)  He had been dead nearly two days, and there was blood on the floor, the bed, and the bedding wrapped around his lower body.  (RT 219, 261.)  He had two stab wounds to his chest, six in his back, one in the

back of his head, one in his right forearm, one each on the tips of two fingers on his right hand, and one on his left thumb. (RT 221.) A hair was in his hand, and a kitchen knife was lying on the floor near his left calf, in between the comforter and sheet wrapped around his lower body. (RT 222-24.) That bedding, and a pillow by the body, had slashes similar to slashes in his shirt. (RT 224.) A military-style knife was found on the opposite side of the bed from the body. (RT 426.)

The first chest wound was two and one-half inches deep and penetrated the heart and lung; the second chest wound was three and one-half inches deep and fractured a rib before penetrating the heart. (RT 226-32.) The six stab wounds in the back were as deep as four and one-quarter inches, and several entered the chest and abdominal cavities, breaking ribs and injuring both kidneys. (RT 232-40.) The stab wound to the back of the head was two and one-eighths inches deep, entered at the nape of the neck, and nicked the back of the skull. (RT 241-42.) The wound to the forearm continued five and one-half inches to the palm of the right hand, injuring an artery. (RT 242-43.) The cuts to the fingers and thumb were superficial incised wounds consistent with grabbing a knife in an attempt to defend oneself. (RT 244-46.) Dr. Mena opined the victim died within a few seconds to a few minutes of the first stab wound, and gave the cause of death as multiple stab wounds to the torso. (RT 249-50, 260.) He opined that the wounds to the back were not inflicted postmortem, but could not say so with complete certainty. (RT 257-66.) The drug Zolpidem, also called Ambien, a prescription sleep aid commonly used by emergency room doctors who have trouble sleeping due to their unusual work hours, was found in the victim's blood at a level within the therapeutic range of a single ten-milligram dose. (RT 273-75, 765-70.)

Dr. Trayers was a United States Naval Officer who worked as a resident in the emergency room at the Balboa Naval Medical Center in San Diego; he had attended a mandatory holiday party on the night of December 3, 2010, and then worked a shift in the emergency room from midnight to 6:00 a.m. on December 4. (RT 277-80; Lodgment No. 3, Augmented Clerk's Tr. ["Aug CT"] at 171-72, 231-33.) Dr. Erin Griffith worked

with Dr. Trayers and testified that when he did not show up for his 11:00 a.m. shift on December 5, she unsuccessfully attempted to contact him and his wife (Petitioner), and then suggested the police be contacted.  (RT 291-94; Aug CT 237.)  Dr. Griffith noticed that Dr. Trayers had posted photographs on Facebook on the morning of December 4, of he and Petitioner during various stages of their marriage, which she thought odd because he had just finished an overnight shift after attending a holiday party and could not have had much sleep at the time he posted the photographs.  (RT 295-96.)

The police conducted a welfare check of the Trayers' residence on December 5, 2010, but there was no response and no signs of anything unusual.  (RT 329-33.)  They checked again at 6:30 a.m. on December 6, 2010, were informed by AT&T that cell phones belonging to the residents were inside, and observed that both Trayers' vehicles were there.  (RT 337-40.)  An officer entered the apartment though a window and found a bed covered in blood, with a female covered in blood lying on her back on the floor apparently dead.  (RT 342, 352-53, 363.)  The officer observed a man lying on the floor next to the bed in a fetal position on the opposite side of the bed as the woman, and summoned paramedics when it was determined the woman was alive.  (RT 356-57.)

Evidence collected from the apartment included, in addition to an empty bottle of Zolpidem on the floor next to the night stand, several manila envelopes containing 218 pages of printouts of: a) phone bills and text messages to and from Dr. Trayers' phone; b) e-mails between Dr. Trayers and a woman named Dr. Danielle Robins discussing how much they loved each other and their future plans together; c) an eight-page email from Petitioner to Dr. Robins; and d) photographs of Dr. Trayers which had notations "ring" and "no ring" depending on whether he was wearing his wedding ring in the photographs. (RT 371-403, 429-37.)  Most of those documents are in the record.  (Aug CT 15-152.) The knife found intertwined in the bedding under Dr. Trayers' body was similar to the knives in a knife block in the kitchen, one of which was missing.  (RT 405-06.)  The military-style knife found near Petitioner was engraved with: "Lt. Fred 'Stick Boy' Trayers" and "U.S.M.C." on one side, and: "Kabar Oleann Y." on the other.  (RT 415,

425-27, 468.)  Other evidence collected at the residence included articles printed from a website titled "anxiety disorders," "building a positive relationship with your spouse," "ten tips for building a strong relationship," "communicating as a couple," "when a couple is under stress" and "social anxiety disorder."  (RT 450-93.)

Dr. Danielle Robins, a physician employed by the United States Navy, testified that in August 2010, she served aboard the hospital ship USS Mercy while a medical student. (RT 518-19.)  She met Dr. Trayers on the first day of her three-week trip, and socialized with him in a small group of medical residents during the trip. (RT 519-20.)  She became friends with Dr. Trayers and continued to correspond with him through text messages and emails after they returned to San Diego. (RT 521.)  They kissed while drunk during the trip, and both felt bad about it, so they decided they would just be friends.  (RT 521-22.) Dr. Trayers told her he had been having problems in his marriage for a very long time, and that his wife had an affair many years before which caused a lot of problems.  (RT 522.)

Dr. Robins testified that in early September 2010, about a week after coming back from their trip on the USS Mercy, she and Dr. Trayers agreed not to pursue a relationship until he decided what to do about his marriage.  (Id.)  They continued corresponding, however, and went running and took hikes together throughout September.  (RT 523.) Toward the end of September and the beginning of October, their relationship began to become intimate, and they began holding hands and kissing.  (RT 523-24.)  Dr. Robins lived in temporary housing when she worked at the Balboa Naval Hospital with Dr. Trayers, and at one point he came to see her at her quarters where "clothes started to come off, things like that," which made her uncomfortable, so they set boundaries limited to kissing and holding hands.  (RT 524.)

Dr. Robins testified that she moved to Maryland at the end of October, 2010, where she continued to correspond with Dr. Trayers as he continued "trying to figure out what he wanted to do with his marriage."  (RT 524-26.)  They told each other they loved each other, and she wanted them to have a future together but he was very stressed about the

situation.  (RT 526-30.)  About a week before he died, Dr. Trayers told her Petitioner was pregnant and it looked like he would not end the marriage, to which Dr. Robins responded by saying they could no longer speak to each other.  (RT 531-32.)  She broke down the next day and communicated with him, but when he confirmed that Petitioner was pregnant, Dr. Robins told him they did not have a future together.  (RT 532-34.)  He was sobbing when he called her around midnight on the east coast and told her he had just left his holiday party, that he was devastated things were over between them, and he felt like a failure.  (RT 534.)  They spoke again the next morning, about 7:00 a.m. San Diego time, and he said he was feeling better because he had spoken with Petitioner and told her he had planned to leave the marriage but if she wanted him to stay for the sake of the baby he would.  (RT 535-36.)  They exchanged texts from the evening of December 3, 2010, until 7:15 a.m. west coast time the next morning, when he wrote that he was going to sleep, which is the last time she heard from him.  (RT 537-43.)

Dr. Robins received two emails a few hours later sent from Dr. Trayers's email account, the first with attached photographs of him on a recent hiking trip.  (RT 543-46.) She assumed the second was from Petitioner because it said "you will never have my husband," along with eight pages detailing how good he is, how much Petitioner appreciates him and loves him, and what she sacrificed for him to become a doctor.  (RT 546-47.)  That email also suggested Dr. Trayers had cheated on Petitioner before, since the beginning of their marriage, that he had unusual sexual proclivities, and commented on many of the topics of the past emails between Dr. Trayers and Dr. Robins.  (RT 548-70.)  It ended by stating "my husband is NOT going to be yours."  (RT 572.)  Dr. Robins tried to contact Dr. Trayers beginning at 11:01 a.m. on December 4, 2010, but never heard from him again.  (RT 576-77.)  Dr. Robins denied ever having sexual intercourse with Dr. Trayers, but she acknowledged that having a sexual affair with a married man is a violation of the Uniform Code of Military Justice which could lead to a dishonorable discharge, the loss of her pension, and perhaps require her to repay the Navy for her medical school expenses.  (RT 645-47, 693.)

The eight-page email sent to Dr. Robins was last modified on November 18, 2010, and forwarded at 8:23 a.m. on December 4, 2010.  (RT 720-22.)  A computer at the Trayers' residence showed five searches for how to crack email passwords.  (RT 726-29.)  A neighbor testified that about 10:30 p.m. on December 3, 2010, she heard the Trayers' door open and close.  (RT 787-90, 796.)  She heard no noises after that, and said they were a quiet couple whom she had never heard argue.  (RT 791-92.)

Forensic experts testified that the hair found in the victim's left hand was similar to a hair sample taken from Petitioner's head and dissimilar to Dr. Trayers' hair, there was a large saturation of Dr. Trayers' blood on the pillow and mattress, and a slash in the pillow and mattress.  (RT 809-13, 823.)  Blood stain patterns in the bedroom indicated that Dr. Trayers was lying down with his head on the pillow when the blood saturation began, and that a large amount of bleeding took place at that spot; blood spatter over the headboard and a dresser on the wall opposite the headboard may have been cast off from his defensive hand wounds.  (RT 824-28, 836.)  Petitioner's blood was found on the bathroom floor, counter and faucet, and had been deposited when she walked into the bathroom dripping blood.  (RT 829-31.)

Deborah Smith, Petitioner's mother, testified that she briefly spoke to Petitioner on the morning of December 4, 2010, when Petitioner told her she was waiting for her husband to come home and they were going to sleep in.  (RT 889-90.)  Smith was not concerned that she did not speak to her daughter the rest of that weekend, but became concerned on Monday morning when she looked at Facebook and saw a posting on Dr. Trayers' page which said people at his work were looking for him and he could not be found.  (RT 896.)  Smith was unaware of any difficulties in her daughter's marriage to Dr. Trayers, and said that everybody loved Dr. Trayers.  (RT 297.)

An empty bottle of Zolpidem recovered from the bedroom contained 45 pills when prescribed to Dr. Trayers on October 25, 2010, and 42 days elapsed between October 25 and December 6, 2010.  (RT 975-77.)  A second bottle of Zolpidem recovered from the
/ / /

1   bedroom had ten pills left; it contained 41 pills when prescribed on October 16, 2010, and

2   there were 51 days between October 16 and December 6, 2010.  (RT 977-78.)

3          Dr. Christina Stanley, a forensic pathologist, testified that she examined Petitioner

4   at the hospital, and said Petitioner had suffered about 36 stab wounds or sharp force

5   injuries over a small area of her chest, mostly superficial, which Dr. Stanley opined were

6   self-inflicted, and that Petitioner had lost a significant amount of blood and was in shock

7   when brought to the hospital.  (RT 994-1008.)  Petitioner's most significant injury was

8   to an artery in the wall of her abdomen, but the wound did not go inside her abdomen.

9   (RT 995.)  Dr. Stanley opined that Petitioner would have remained conscious for a very

10  long time and been able to move around and seek help for hours after she sustained her

11  injuries.  (RT 1009-10.)  Dr. Stanley said, hypothetically, that if Petitioner had taken ten

12  Ambien pills she might not have been able to walk around.  (RT 1037-38.)

13         Dr. Michael Sise, a vascular surgeon and trauma medical director at Scripps Mercy

14  Hospital, testified that he treated Petitioner's knife wounds and opined they were

15  self-inflicted.  (RT 1082-83.)  Although Petitioner responded to their questions when she

16  was admitted to the hospital, she was incoherent.  (RT 1091-91.)  She received a blood

17  transfusion nearly equal to her entire blood volume, and would have died in six to eight

18  hours without treatment.  (RT 1091-95.)  Dr. Sise found no self-defense wounds, and said

19  the multiple wounds in her chest were "hesitation marks," a term used to describe

20  superficial wounds that penetrated the skin but not deeply.  (RT 1084-85.)  He opined that

21  Petitioner was initially able to walk around with her injuries, and said she was not

22  pregnant.  (RT 1086-92, 1111.)  Friends of Dr. Trayers testified they never saw him lose

23  his temper, get angry or act aggressively, and said he was not a violent person.  (RT

24  1121-24; Aug CT 218.)

25         The trial judge denied a renewed defense motion (discussed below in Claim 2),

26  which had been denied prior to trial, seeking to exclude the testimony of Orvill Webb as

27  irrelevant and unduly prejudicial.  (RT 1112-19.)  Webb then testified that he worked

28  with Petitioner in Florida in 2001-02, and they began a sexual affair in 2002, when they

were both married, which continued until Petitioner left Florida in 2004 or 2005.  (RT 1129-32.)  Webb said he was confronted by his wife when the affair had been going on for about a year and a half, which led to their divorce.  (RT 1132.)  Webb testified that although he and Petitioner took breaks during the affair, those breaks lasted a week or two at a time, and he specifically denied there was break of six or eight months in the sexual aspect of their affair.  (RT 1132-37.)  The People rested.  (RT 1138.)

The trial judge denied a defense motion for acquittal which, as discussed below in Claim 3, argued there was insufficient evidence to support a murder conviction.  (RT 1170-74.)  Petitioner's mother and stepfather both testified they never saw Petitioner or Dr. Trayers engage in any kind of physical or verbal altercation, and said the couple were good and kind to each other.  (RT 1143-44, 1167-68.)

Petitioner testified that she met Dr. Trayers in 1991 when he was in the Navy training to be a pilot, and they eloped in 1992.  (RT 1177-79.)  She said there was never any instance of physical violence or severe arguments between them throughout their entire marriage.  (RT 1180, 1182, 1207, 1211.)  In 1997, after living in San Diego for five years, they moved to Nevada where Dr. Trayers taught at the Top Gun flight school.  (RT 1183-84.)  It was there that Dr. Trayers met Danielle Merket, a civilian who lived in Florida and conducted psychological research on Navy pilots.  (RT 1185-86.)

Petitioner testified that she and her husband moved to Fort Lauderdale, Florida in 2001, where he started medical school while she worked to support them.  (RT 1187-89.)  Petitioner, Dr. Trayers and Merket all spent time together and were friends during the four years Petitioner and Dr. Trayers lived in Florida.  (RT 1190-92.)  Petitioner said she was not jealous when Dr. Trayers and Merket went on a hiking trip without her to Wyoming, explaining that she and her husband both had opposite-sex friends and neither was jealous.  (RT 1192-94.)  After that trip, however, Petitioner came to believe that her husband and Merket were having an affair.  (RT 1198-99.)  About that time, Petitioner met Orvill Webb, who worked with Petitioner, and they began a sexual affair in early 2003.  (RT 1200-01.)  Petitioner was upset with her husband's affair at the time, and

thought their marriage was over.  (RT 1202.)  About two months after her affair with Webb began, Webb's wife told Dr. Trayers about it, and Dr. Trayers confronted Petitioner.  (RT 1202-03.)  Petitioner admitted it and offered to end their marriage, but Dr. Trayers responded by saying it was his fault for ignoring her and that he wanted her to stay.  (RT 1203-04)  She said she decided to stay in the marriage because she knew he could not afford to stay in medical school without her financial support.  (RT 1205.) Petitioner said she and Webb stopped their sexual relationship when Dr. Trayers found out, but remained friends, and resumed their sexual relationship in the fall of 2004, until it ended when Petitioner and Dr. Trayers moved from Florida in 2005 after he graduated from medical school.  (RT 1205-11.)  In contrast to Webb's testimony, Petitioner testified that the sexual aspect of their relationship lasted "maybe three or four months" total out of the year and a half they were friends.  (RT 1202-03, 1210.)

Petitioner testified that she and Dr. Trayers moved to San Diego in 2005, where they agreed to put their affairs behind them, and they renewed their marriage vows in 2007 on their 15th anniversary.  (RT 1208-15.)  Petitioner became angry, however, when she caught Dr. Trayers emailing Merket late in 2007.  (RT 1216-17.)  But Petitioner said her relationship with Dr. Trayers from early 2010 to early August of that year was good, and there was no hint he was seeing someone else.  (RT 1219-22.)

Petitioner testified that Dr. Trayers took a trip on the USS Mercy in August 2010, and when he returned in early September she became suspicious over the amount of time he spent sending text messages on his phone.  (RT 1223-26.)  She became anxious because she felt something was wrong, and they began going to marriage counseling together in late September at Dr. Trayers' suggestion.  (RT 1229-30.)  She told the counselor during a joint session that she thought her husband was having an affair, but he denied it, and she thought he was lying.  (RT 1232-33.)

In early October 2010, Petitioner installed spyware software on their home computer and on Dr. Trayers' laptop, and saw an email from someone she assumed was Merket.  (RT 1238-43.)  She felt sick when she read that email, and began to print his

emails, texts and phone bills. (RT 1244-47.) She came home early from work one day in early October, and when Dr. Trayers arrived home a few minutes later he was sweaty but not wearing workout clothes, was not wearing his wedding ring, which was unusual, and insisted on taking a shower before talking to her, which increased her suspicion he was cheating on her. (RT 1250-54.) She began losing weight and having trouble sleeping due to anxiety, and confronted Dr. Trayers in mid-October about the hundreds of text messages he had sent to Dr. Robins in Maryland. (RT 1245-55.) One email from Dr. Robins addressed Dr. Trayers as "Mr. Wonderful," which upset Petitioner because although Dr. Robins and Dr. Trayers had only known each other a short time, it sounded like they knew each other well and were in an exclusive relationship. (RT 1258.)

Petitioner said she started feeling better when she deduced from the emails that Dr. Trayers' relationship with Dr. Robins had ended when Dr. Robins was transferred, but then in late November she saw an email stating Dr. Robins was to be stationed at Camp Pendleton, after which her husband requested to be stationed there. (RT 1266-74.) By mid-November 2010, Petitioner began feeling anxious and losing weight, and threatened and offered to end the marriage multiple times, but Dr. Trayers told her he would follow her if she left so she might as well stay. (RT 1276-87.) In late November, Dr. Trayers removed all the photos of the two of them from his Facebook page. (RT 1287-89.) She continued printing and collecting emails and texts which indicated to her that her husband was completely enamored with Dr. Robins, wanted a future with her, and wanted to divorce Petitioner. (RT 1290, 1429-30.) Petitioner testified she had never been pregnant and had never told her husband she was pregnant. (RT 1290-91.)

Petitioner testified that the eight-page email she sent to Dr. Robins was a journal Petitioner began in October 2010 at the suggestion of her marriage counselor, and consisted of a therapeutic exercise as to what Petitioner would say to Dr. Robins if they could speak. (RT 1295-1300.) A copy is in the record. (Aug CT 78-85.) She told Dr. Robins in that email that if Dr. Robins had stopped talking to Dr. Trayers they would not be in a situation where he could not decide which one of them he wanted to be with. (RT

1432.)  Petitioner testified she was confused at that time because Dr. Trayers was acting at home like their marriage was just fine, but the emails he exchanged with Dr. Robins suggested the marriage was horrible.  (RT 1301.)  She made the last entry in her journal on December 1, 2010, and said there was no entry on the morning of December 4.  (RT 1303.)  Petitioner testified that when she sent the eight-page email to Dr. Robins which stated: "I will have the joy of knowing I got to spend quality time with him," and: "I got to see him every day," she had no plans to kill her husband, even though those comments seemed to be in the past tense, because she wrote them in mid-November when she was considering suicide.  (RT 1306-08.)  She thought her husband would be devastated if she killed herself, and said she did not know whether he was lying to her or to Dr. Robins about the state of their marriage.  (RT 1309-10.)

Petitioner testified that on December 3, before Dr. Trayers left for his holiday party, he sat down with her and told her he would never leave her, and that he wanted to start being honest with her and communicating more.  (RT 1325.)  She wanted him to admit his affair with Dr. Robins, but did not confront him about it at that time because she had not told him she had been reading his emails and texts.  (RT 1326-27.)  He left for the party about 7:00 p.m., came back from the party for 30-40 minutes at about 10:00 p.m., and then left to work an overnight shift.  (RT 1327-29.)  She did not sleep that night, but lay awake worrying about their relationship.  (RT 1330.)

Dr. Trayers came home from work at around 7:30 a.m. on December 4; they talked about the holiday party and he said there would be pictures of it on Facebook.  (RT 1330-32.)  Petitioner said to him: "Speaking of Facebook, what happened to all the pictures of you and I on Facebook?"  (RT 1332.)  He told her he did not know what she was talking about, and she became angry that he was "playing dumb."  (RT 1332-33.)  They sat at the computer and he pretended he did not know how the pictures had disappeared.  (RT 1333.)  He then posted pictures of the two of them on Facebook and said: "Now are you happy?" in a condescending voice which made her angry.  (RT 1335-36.)

Petitioner testified that Dr. Trayers then said he wanted to take a nap for a few hours, and went to the bathroom. (RT 1337-38.) While he was in the bathroom she stayed at the computer and took advantage of the first time he had ever left his email account open; she found 12 to 15 emails she had not seen before which she thought were sent by Dr. Robins from mid-November to December, and deleted them without reading them. (RT 1338-41, 1348-49.) She was angry and frustrated because she thought he had stopped communicating with Dr. Robins, and sent an email to Dr. Robins from Dr. Trayers' email account at about 8:30 a.m. with photos attached showing him wearing his wedding ring. (RT 1340-45.) She then sent her journal to Dr. Robins as an eight-page email using his account, and then deleted his email account. (RT 1346-49, 1358.) She said at that point she had no plans to kill him. (RT 1349.)

Petitioner testified that when Dr. Trayers came out of the bathroom, she asked if they could talk about being honest and communicating more, but he said she should calm down, take a nap, and they would talk at lunch. (RT 1349-50.) He said they should both take Ambien and get some sleep. (RT 1355.) At this time, about 8:30 a.m., Petitioner said her husband received a phone call from a Virginia area code, which he let go to voice mail rather than answer, and which Petitioner assumed was from Dr. Robins. (RT 1355.) Petitioner had no explanation why the forensic evidence established that call was received on Dr. Trayers' phone at 10:59 a.m. (RT 1443-44.)

Petitioner testified that Dr. Trayers crushed more than one Ambien pill, put them in orange juice, and they each drank half. (RT 1356.) She became increasingly anxious and angry, but he kept saying he wanted to take a nap before talking. (RT 1359-60.) She retrieved the manila envelopes in which she had been keeping the emails she had printed out the past few months, and showed them to Dr. Trayers, who shook his head and said he did not want to talk about them, that it was over and done with, that he was going to bed to read, and they could talk at lunch. (RT 1360-62.) She slammed the envelopes down on the kitchen counter because: "I was pissed off that he won't talk to me about them." (RT 1362.) She stood there thinking what to do, and was worried she would fall

asleep and he would wake before her and leave without talking, so she grabbed a butcher knife off the counter.  (RT 1362-63.)  She did not want to kill or stab him with the knife, but wanted to use it to hurt herself in order to get his attention.  (RT 1363.)

Petitioner testified that Dr. Trayers was sitting up in bed reading a magazine article.  (RT 1363.)  He was under the comforter and the flat sheet which were pulled up to the middle of his chest, and he had tightly tucked the flat sheet under the corners of the mattress "military style" as was his custom.  (RT 1360-61, 1390-1401.)  Petitioner crawled into bed and was sitting on her knees holding the knife in her right hand.  (RT 1365-66.)  She held the knife to her wrists, moved the knife side-to-side across her wrists, and asked him: "If I'm going to cut my wrists, is this the way I do it?"  (RT 1366-67.)  She thought he would stop her but he started laughing, as if he did not think she was serious, and told her the knife was not sharp enough.  (RT 1368-69.)  He said he had a better or sharper knife, and bent over to retrieve a military knife from the bottom drawer of the night stand.  (RT 1370-71.)  She set the kitchen knife on the night stand, and: "jump[ed] over him and grab[bed] [the military knife] before he can get it."  (RT 1371.)  When asked why she grabbed the military knife, she said: "Cause I was very confused by [his] reaction that I didn't know if he grabbed the knife what was going to happen." (Id.)

With the military knife in her hand, she asked him in the same manner as before if that was the proper way to slit her wrists.  (RT 1372.)  He told her that if she wanted to kill herself she could cut an artery that ran down her arm, and she started poking at that artery with the knife.  (RT 1372-73.)  He did not respond and she grew angrier; she poked herself in the wrist and started to bleed, but he thought it was funny and her anger increased.  (RT 1373-75.)  She held the knife to her chest and asked where she should stab herself in her chest to kill herself, and he said "lower."  (RT 1376-77.)  She became angrier than she had ever been in her life, and continued cutting herself on her chest trying to get his attention.  (RT 1377-78.)  He grabbed her wrist with his left hand, tried to take the knife away, and said "let me help you."  (RT 1379, 1389.)  Although he was

1   right-handed, he used his left hand because she was unintentionally kneeling on his right

2   hand.  (RT 1381.)  She said she was not feeling the effects of Ambien at that time, and

3   said he did not seem to be feeling its effects either.  (RT 1379-80.)  She and Dr. Trayers

4   started wrestling, and he got his right hand out from under her as they struggled over the

5   knife.  (RT 1382.)  She was stabbed in the chest three or four times during the struggle.

6   (RT 1383.)  She had no idea how many times she poked herself in the chest before he

7   grabbed the knife, but she did not think she had caused the 36 chest wounds she was

8   treated for at the hospital, and said that only three or four of the cuts to her chest, which

9   were the deepest, were caused during the struggle.  (RT 1387-88.)  She said the knife

10  remained pointed at her throughout the struggle even though her arms were swinging

11  wildly, and he never had his hand on the knife, only her wrist.  (RT 1389-91.)

12      Petitioner said she "was getting hot and just angry and . . . just upset and like

13  pissed off at what was going on why this was happening and who was this person in the

14  room with me because it wasn't [Dr. Trayers]."  (RT 1392.)  In order to force him to

15  release his grip on her wrist, she leaned over him and banged his left arm on the side of

16  the mattress.  (RT 1394.)  She got her wrist free somehow, and Dr. Trayers reached with

17  his right hand for the butcher knife on the night stand next to his side of the bed.  (RT

18  1395-96.)  He touched the handle of the knife but it fell on the floor, and she stabbed him

19  with the military knife in the back of the neck; she said she intentionally aimed for that

20  spot because "it was the first place I saw skin showing."  (RT 1396-97.)  Neither of them

21  had said anything since he had said "let me help you."  (RT 1397-98.)

22      Dr. Trayers laid back down on the bed for a few seconds holding his hand on the

23  back of his head, as she sat on the bed with her adrenaline "rushing."  (RT 1398.)  He

24  then stood up by the night stand next to his side of the bed with his feet tangled in the

25  tightly tucked flat sheet, faced her, and pulled the comforter and flat sheet from

26  underneath her.  (RT 1398-1401.)  Petitioner said she saw Dr. Trayers bend down as if

27  to pick up the kitchen knife, and then she blacked out and had no memory of stabbing

28  him multiple times in the chest and back.  (RT 1401-02.)  Her next memory was of

waking up on the bed with him lying on the floor next to the bed.  (RT 1402.)  She then took all the Ambien pills, about ten, in a bottle on a night stand.  (RT 1405-06.)  Her next memory after that was waking up on the bathroom floor.  (RT 1403.)  She tried to crawl back to her husband from the bathroom floor but did not make it, and her next memory was of a police officer speaking to her.  (RT 1403-04.)  Petitioner testified that she did not specifically intend to kill her husband that morning, and was not so jealous of his relationship with Dr. Robins that she wanted him dead.  (RT 1408-09.)  She denied it was a murder-suicide attempt, and said she felt remorse because he did not deserve to die.  (RT 1409.)

A marriage and family therapist testified that she was contacted by Dr. Trayers in September 2010, with a request for couples counseling.  (RT 1470-71.)  They had nine counseling sessions ending on November 23, 2010.  (RT 1473-76.)  The defense rested and there was no rebuttal.  (RT 1475-76.)

The jury was instructed and provided with copies of their instructions.  (RT 1506-27.)  The prosecutor sought a first degree murder conviction based on premeditation or laying in wait.  (RT 1519-21.)  The jury was instructed that provocation may reduce first degree murder to second degree murder, or to manslaughter, where the provocation would cause a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.  (RT 1521-22.)  The attorneys then presented closing argument.  (RT 1527-1642.)  As discussed below with respect to Claim 1, the prosecutor erroneously argued to the jury that in order for murder to be reduced to manslaughter, the evidence would have to show that the provocation would have caused a person of average disposition to "kill" or to "have reacted in the same manner" as Petitioner, rather than rashly and without due deliberation.  (RT 1550-54.)  After deliberating three days, the jury found Petitioner not guilty of first degree murder, but guilty of the lesser-included offense of second degree murder, and found she had personally used a deadly weapon, a knife.  (RT 1658; CT 228-37.)  She was sentenced to 16 years-to-life in state prison.  (RT 1671.)

**IV.**

**PETITIONER'S CLAIMS**

(1)  Petitioner's Fourteenth Amendment right to due process was violated because the prosecutor's closing argument misstated the law and advocated for a lower burden of proof regarding when provocation can reduce murder to manslaughter, and because the state appellate court applied an incorrect standard of review in finding that error to be harmless.  (Pet. at 6.)

(2)  Petitioner's Fourteenth Amendment rights to due process and a fair trial were violated by the introduction of irrelevant and prejudicial evidence of her long-ended extramarital affair.  (Pet. at 7.)

(3)  Petitioner's Fourteenth Amendment right to due process was violated because there is insufficient evidence to support a finding of any crime greater than voluntary manslaughter.  (Pet. at 8.)

**V.**

**DISCUSSION**

For the following reasons, the Court finds judicial economy counsels in favor of addressing the merits of Claim 1 without determining whether the claim is procedurally defaulted.  The Court also finds Petitioner is not entitled to federal habeas relief because the adjudication of her claims by the state court is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and, alternately, assuming the provisions of section 2254(d) could be satisfied with respect to Claims 1 and 2, any federal constitutional errors are harmless.  The Court **RECOMMENDS** the Petition be **DENIED**.

**A.     Standard of Review.**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, that a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d) (West 2006).  Even if Petitioner satisfies the provisions of section 2254(d), or shows they do not apply, she must still demonstrate that a federal constitutional violation occurred in order to obtain habeas relief.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007).  She must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most constitutional errors can be harmless."); but see Jackson v. Virginia, 443 U.S. 307, 319 (1979) (holding that federal habeas relief must be granted if "all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt.")

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Id. at 407.  Relief under the "unreasonable application" clause of section 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta," of United States Supreme Court decisions at the "time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.  To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court adjudication rests, assuming it rests upon a determination of the facts, are objectively unreasonable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

**B.    Claim 1**

Petitioner contends in Claim 1 that her Fourteenth Amendment right to due process was violated because at least one juror might have found that a reasonable person would have acted rashly under the circumstances, and therefore find the killing to be manslaughter rather than murder, if they had not been told by the prosecutor that in order to convict her of manslaughter they had to find that a reasonable person would have killed or acted like she had acted under the circumstances.  (Pet. at 6.)  She argues that when the state court found the error to be harmless, it erroneously applied the test for whether the prosecutor's misstatement of the law was error rather than the test for whether the error was harmful or prejudicial.  (<u>Id.</u>)

Respondent answers that Claim 1 is procedurally defaulted because the state appellate court found the claim forfeited by Petitioner's failure to object at trial to the prosecutor's argument.  (Ans. Mem. at 15-16.)  Respondent also argues that the state appellate court's discretionary adjudication of the claim on the merits is neither contrary to, nor an unreasonable application of, clearly established federal law.  (<u>Id.</u> at 16-20.)

Petitioner replies that she can show cause and prejudice to excuse any default, and argues that a fundamental miscarriage of justice would result if this Court fails to reach the merits of the claim.  (Traverse at 5-6.)  She contends a default would unfairly result in the loss of the claim due to her counsel's ineffective assistance in failing to object at trial.  (<u>Id.</u> at 6.)

15cv0924

**1.  Procedural Default**

In order to preclude federal review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to forever bar federal review.  Coleman v. Thompson, 501 U.S. 722, 735 (1991).  To be "independent" the state law basis for the decision must not be interwoven with federal law.  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  In order to be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default."  Calderon v. Bean, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  The burden then shifts to Petitioner to challenge the independence or adequacy of the procedural bar, and if Petitioner does so, the ultimate burden of proof falls on Respondent.  Id.  This Court may still reach the merits of a defaulted claim if Petitioner demonstrates cause for the failure to object and prejudice from the default, or where a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim.  Coleman, 501 U.S. at 750.

Petitioner presented Claim 1 to the state supreme court in a petition for review of the appellate court's opinion affirming her conviction.  (Lodgment No. 8.)  That petition was denied by an order which stated: "The petition for review is denied."  (Lodgment No. 9, People v. Trayers, No. S217120, order at 1.)  She raised the same claim in the state appellate court.  (Lodgment No. 4.)  There is a rebuttable presumption that the state supreme court, in silently denying the petition for review, adopted the reasoning of the state appellate court.  Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).  The appellate court, before addressing the merits of the claim, stated:

> At the threshold, the Attorney General argues [Petitioner] forfeited appellate review of her claim of prosecutorial misconduct by failing to object in the trial court to the statements she now contends constituted misconduct and by failing to request an appropriate curative admonishment. We agree.

A defendant may not complain of prosecutorial misconduct on appeal unless he or she objected at trial on that ground, in a timely fashion, "'and also requested that the jury be admonished to disregard the perceived impropriety.'"   (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)   The California Supreme Court has explained that "(t)he primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice. (Citation.)   Obviously, that purpose can be served only if defendant is required to, and does, raise any objection before the jury retires." (*People v. Williams, supra*, 16 Cal.4th at p. 254.)

Here, [Petitioner] concedes that "(d)efense counsel did not object to the prosecutor's argument," and she impliedly acknowledges that she thereby forfeited her prosecutorial misconduct claim, suggesting that her trial counsel was constitutionally ineffective for failing to preserve the claim for appellate review.  However, she asks this court in its discretion to reach the merits of her claim.

An appellate court has discretion to adjudicate an important question of constitutional law despite a party's forfeiture of the right to appellate review.  (*People v. Johnson* (2004) 119 Cal.App.4th 976, 985; *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1061.)  In the exercise of discretion, we now reach the merits of [Petitioner]'s claim of prosecutorial misconduct.

(Lodgment No. 7, <u>People v. Trayers</u>, No. D061564, slip op. at 34-35.)

"[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. . . . In this way, a state court may reach a federal question without sacrificing its interest in finality, federalism, and comity." <u>Harris v. Reed</u>, 489 U.S. 255, 264 n.10 (1989).  "State procedural bars are not immortal, however, they may expire because of later actions by state courts.  If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." <u>Ylst</u>, 501 U.S. at 801, citing <u>Harris</u>, 489 U.S. at 262-63 ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted); <u>see also</u> <u>Richter</u>, 562 U.S. at 99-100 (holding that the presumption that a silent denial by a state supreme court is an adjudication on the merits "may be overcome when there is reason to think some other explanation of the state court's decision is more likely."), citing <u>Ylst</u>, 501 U.S. at 803 and <u>Harris</u>, 489 U.S. at 265.

The state appellate court here, in exercising its discretion to review the merits of the forfeited claim, acknowledged it was avoiding addressing allegations of ineffective assistance of counsel arising from defense counsel's failure to object and request a curative jury instruction. Even if federal habeas review of the Fourteenth Amendment due process claim is foreclosed due to a default, the same would not necessarily be true of a properly raised Sixth Amendment ineffective assistance of counsel claim. See e.g., Kimmelman v. Morrison, 477 U.S. 365, 374-80 (1986) (holding that the restriction on federal habeas review of Fourth Amendment search and seizure claims does not extend to Sixth Amendment ineffective assistance of counsel claims based on constitutionally ineffective representation with respect to a failure to bring a suppression motion). In addition, Petitioner may be able to demonstrate cause to excuse the default by showing she received constitutionally ineffective assistance of counsel. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

When Petitioner requested the appellate court to exercise its discretion to set aside her forfeiture and reach the merits of the claim, she argued that "judicial economy is a principal rationale of the forfeiture doctrine," and that application of the forfeiture rule in this case "would likely have the effect of converting an appellate issue into a habeas corpus claim of ineffective assistance of counsel for failure to preserve the question by timely objection [which] would proliferate rather than reduce the nature and scope of legal proceedings." (Lodgment No. 4 at 58 [ECF No. 13-15 at 71].) Petitioner argued in her petition for review in the state supreme court that the proper standard of review for Claim 1 is nearly identical to the standard for prejudice in an ineffective assistance claim. (Lodgment No. 8 at 15 [ECF No. 13-19 at 25], citing Strickland v. Washington, 466 U.S. 668 (1984).)

Thus, to the extent Petitioner was invited to abandon an ineffective assistance of counsel claim by the state appellate court's exercise of its discretion to reach the merits of Claim 1, this Court must address whether "the California Supreme Court exercised its discretion in a surprising or unfair manner" by silently adopting the appellate court's

alternative holding that the claim was forfeited.  See Walker v. Martin, 562 U.S. 307, 320 (2011) ("A state ground, no doubt, may be found inadequate when discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law.") (internal quotation marks omitted); Lee v. Kemma, 534 U.S. 362, 376 (2002) (recognizing exception to bar on federal review where "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.")  Petitioner essentially makes that argument.  (See Traverse at 5-6.)

The adequacy of a state procedural rule "is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'"  Kemma, 534 U.S. at 375, quoting Douglas v. Alabama, 380 U.S. 415, 422 (1965).  Thus, to determine if federal review of Claim 1 is foreclosed as a result of forfeiture arising from defense counsel's failure to object and request a curative instruction, the Court must determine: (1) whether the state supreme court reached the merits of the claim or adopted the appellate court's alternate holding that the claim was forfeited, or both; (2) whether the procedural rule is adequate to support the judgment, which includes a determination whether application of the bar in this case would unfairly result in the loss of an ineffective assistance of counsel claim based on the same facts; and (3) whether Petitioner can overcome the procedural bar by demonstrating cause and prejudice or the existence of a fundamental miscarriage of justice.  The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."  Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")  As set forth below, Claim 1 fails on the merits.  Accordingly, the Court finds that the interests of judicial economy support addressing the merits of Claim 1 without determining whether it is procedurally defaulted.

## 2. Merits

The state appellate court addressed the claim on the merits, stating:

> [Petitioner] contends the prosecutor misstated the law, and thereby committed prosecutorial misconduct, during her closing arguments by arguing that the degree of provocation required to reduce the unlawful killing of her husband from murder to voluntary manslaughter was provocation that would cause a reasonable person to kill, thereby lowering the People's burden of proof in violation of her due process right to a fair trial. This contention is unavailing.

> A. *Applicable Legal Principles* (*Prosecutorial Misconduct*)

> "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." *(People v. Morales* (2001) 25 Cal.4th 34, 44.)

> When a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, "'the question is whether there is a *reasonable likelihood* that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" *(People v. Cole, supra,* 33 Cal.4th at pp. 1202–1203, italics added, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

> "(I)t is misconduct (for a prosecutor) to misstate the law during argument." *(People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21, citing *People v. Boyette* (2002) 29 Cal.4th 381, 435.)

> B. *Background*

> The court instructed the jury on voluntary manslaughter based on heat of passion by giving CALCRIM No. 570. The court's instruction stated in relevant part:

> > "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment.*" (CALCRIM No. 570, italics added.)

> During her closing argument, the prosecutor discussed the heat of passion form of voluntary manslaughter and what constituted sufficient provocation. She then made the following statements that [Petitioner] now claims, for the first time, misstated the law regarding provocation:

> > "You decide whether the provocation was sufficient.

> > "What does [Petitioner] tell you about it?

-25-

"You decide whether a person of average disposition in the same situation, knowing the same facts, knowing the same circumstances, would that person, that average person, have *reacted in the same manner* from passion, rather than judgment(.)  (¶) . . .

"Well, *would a person of average disposition kill* if under those circumstances this husband, who had been an ideal husband as described in this letter . . . . (¶) . . .

"If that were to occur where a person were to say 'Don't do it like this.  Cut it that way,'" laugh, get up.  Get up off that bed.  Get out of that room.  Get out of that condo and leave that marriage.  Walk out.  Go.

"But stab a man in the head, in the chest, in the back nine times for that?  Is that sufficient provocation?  *Is that sufficient reason to kill*?"  (Italics added.)

Shortly thereafter, the prosecutor argued, "Again, the defendant cannot set her own standard.  It has to be how a person of average disposition *would react*."  (Italics added.)

C. *Analysis*

[Petitioner] contends the prosecutor's foregoing argument misstated the law regarding provocation, and thereby constituted misconduct, because the prosecutor "encouraged jurors to consider whether the provocation would cause an average person to do what ([Petitioner]) did—kill the victim."

\* \* \*

2. *Merits*

[Petitioner] asserts that the prosecutor misstated the law, and thereby committed misconduct, by telling the jurors that, in deciding whether the provocation in this case was sufficient to reduce the unlawful killing of Dr. Trayers from murder to voluntary manslaughter, they had to decide whether a person of average disposition under the same circumstances "would . . . have *reacted in the same manner* from passion, rather than from judgment" (italics added).  She asserts the prosecutor again misstated the law by arguing that the jury had to decide whether "a person of average disposition (*would*) *kill*" (italics added) under the same circumstances and that the standard to be applied was "how a person of average disposition *would react*."  (Italics added.)

Citing *Beltran, supra*, 56 Cal.4th 935, the Attorney General acknowledges that, "(t)o the extent that the prosecutor focused on the act (to kill), rather than the reaction (with reason and judgment obscured), *Beltran* clarified that the prosecutor made a mistake in her interpretation of the law."

[Petitioner] and the Attorney General agree, correctly, that the prosecutor's remarks to the jury misstated the applicable law regarding the standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion and reduce a murder to voluntary manslaughter.  In *Beltran*, the California Supreme Court recently held that the proper standard to be applied in deciding whether provocation is legally sufficient

15cv0924

to constitute heat of passion [Footnote: The *Beltran* court defined "heat of passion" as "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran, supra*, 56 Cal.4th at p. 942.] is not whether an ordinary person of average disposition—at the time of the killing—would *kill* under the same circumstances, but whether an ordinary person of average disposition under those circumstances would act rashly and without due deliberation or reflection and from passion rather than judgment. (*Beltran, supra*, 56 Cal.4th at p. 942, citing *People v. Barton* (1995) 12 Cal.4th 186.) The *Beltran* court explained its holding:

> "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. To satisfy (the applicable standard), the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Beltran, supra*, 56 Cal.4th at p. 949, italics omitted.)

*Beltran* also held that the proper standard is set forth in CALCRIM No. 570, which states: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment.*" (*Beltran, supra*, 56 Cal.4th at p. 954, fn. 14, italics added.)

Although the prosecutor made remarks to the jury (discussed, *ante*) that misstated the standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion, we conclude reversal of [Petitioner]'s conviction of second degree murder is not required because she has not shown, and cannot demonstrate, "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole, supra*, 33 Cal.4th at pp. 1202–1203.) The court instructed the jury with CALCRIM No. 570, which sets forth the proper standard. (*Beltran, supra*, 56 Cal.4th at p. 954, fn. 14.) The court also instructed the jury under CALCRIM No. 200 (2008 rev.) that it would "now instruct . . . on the law that applies to this case," that each juror "has a copy of (the) instructions to use in the jury room," that the jury "must follow the law as I explain it to you," and that "(i)f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

On appeal, we presume the jurors understood and followed the trial court's instructions. (*People v. Hinton* (2006) 37 Cal.4th 839, 871.) Thus, we presume the jury in this case understood and followed the version of CALCRIM No. 570 given by the court. Accordingly, because we presume the jury followed the court's instructions and nothing in the record shows otherwise, we conclude the jury ignored the prosecutor's misstatements during closing argument, followed the court's instructions, and applied the

15cv0924

proper standard set forth in CALCRIM No. 570 in deciding whether any provocation by Dr. Trayers was legally sufficient to constitute heat of passion that would reduce [Petitioner]'s killing of Dr. Trayers from murder to voluntary manslaughter.

(Lodgment No. 7, <u>People v. Trayers</u>, No. D061564, slip op. at 32-38.)

Clearly established federal law provides that, in order to constitute a federal due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987), quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). The misconduct must be reviewed in the context of the entire trial. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). Even where misconduct rises to the level of a federal constitutional error, federal habeas relief is not available if the error was harmless. <u>Fields v. Woodford</u>, 309 F.3d 1095, 1109 (9th Cir. 2002), citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (holding that an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict.")

Petitioner argues that at least one juror might have found that a reasonable person would have acted rashly under the circumstances, and therefore find the killing to be manslaughter rather than murder, if they had not been told by the prosecutor that in order to convict her of manslaughter they had to find that a reasonable person would have killed under the circumstances, or that a reasonable person would have acted like Petitioner had acted under the circumstances. (Pet. at 6.) She also argues that when the state court found the error harmless because Petitioner had failed to show "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion," it was erroneously applying the test for whether prosecutorial misconduct occurred, rather than the test for whether the misconduct was prejudicial or harmless. (<u>Id.</u>)

Respondent answers that it was not objectively unreasonable for the state appellate court to find Petitioner received a fair trial despite the prosecutor's misstatement of the law, because the prosecution presented strong evidence that Petitioner intended to kill her husband, and the evidence simply did not support a finding that a person of average

1    disposition would have acted rashly and without judgment under the circumstances.

2    (Ans. Mem. at 19-20.)   Respondent also argues that any federal constitutional error is

3    harmless under the <u>Brecht</u> standard.   (<u>Id.</u>)

4        For the following reasons, the Court finds the state appellate court's adjudication

5    of Claim 1 is not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).

6    Alternately, assuming Petitioner could satisfy the provisions of section 2254(d), the Court

7    finds that no federal constitutional error occurred.   Finally, assuming a federal

8    constitutional error occurred, the Court finds any error to be harmless.

9        **a)  The appellate court opinion is not objectively unreasonable**

10       The Court first addresses Petitioner's argument that the adjudication of Claim 1 by

11   the state appellate court is contrary to, or an unreasonable application of, clearly

12   established federal law, because in finding there was no "reasonable likelihood that the

13   jury construed or applied any of the [prosecutor's erroneous] remarks in an objectionable

14   fashion," it applied the test for whether there was prosecutorial misconduct, not whether

15   there was harmless error.  Clearly established federal law provides that when a state court

16   finds a federal due process violation arising from prosecutorial misconduct, the state

17   court is required to determine whether the error is harmless beyond a reasonable doubt.

18   <u>See</u> <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967) (holding "that before a federal

19   constitutional error can be held harmless, the [state] court must be able to declare a belief

20   that it was harmless beyond a reasonable doubt.")   AEDPA deference does not apply

21   where the state court uses a wrong legal standard.   <u>Wade v. Terhune</u>, 202 F.3d 1190,

22   1195 (9th Cir. 2000).   However, the state appellate court here did not find a federal

23   constitutional violation, but stated:

24           "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make

25   the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct

26   under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." *(People*

27   *v. Morales* (2001) 25 Cal.4th 34, 44.)

28                                       * * *

> Although the prosecutor made remarks to the jury (discussed, *ante*) that misstated the standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion, we conclude reversal of [Petitioner]'s conviction of second degree murder is not required because she has not shown, and cannot demonstrate, "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole, supra*, 33 Cal.4th at pp. 1202-1203.)

(Lodgment No. 7, People v. Trayers, No. D061564, slip op. at 32, 37.)

The court in Cole, cited by the appellate court, recognized that: "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." Cole, 33 Cal.4th at 1202 (internal quotation marks omitted), citing Darden v. Wainwright, 477 U.S. 168, 181 (1986) and DeChristoforo, 416 U.S. at 643. Thus, the state appellate court correctly recognized that the test for whether prosecutorial misconduct rises to the level of a federal due process violation is different than whether the prosecutor's comments violated state law. See Fields, 309 F.3d at 1108 ("On federal habeas review, we do not ask whether the 'prosecutor's remarks were undesirable or even universally condemned."), quoting Darden, 477 U.S. at 181; see also Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) ("Improper argument does not, per se, violate a defendant's constitutional rights."); Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) ("The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."), quoting Darden, 477 U.S. at 181.

The state appellate court also found that: "because we presume the jury followed the court's instructions and nothing in the record shows otherwise, we conclude the jury ignored the prosecutor's misstatements during closing argument, followed the court's instructions, and applied the proper standard . . . ." (Lodgment No. 7, People v. Trayers, No. D061564, slip op. at 38.) Clearly established federal law provides for a presumption that jurors follow their instructions. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive

to understand, makes sense of, and follow the instructions given them.")  That presumption may be overcome where there is "a strong likelihood that the effect of the [error] would be devastating to the defendant."  <u>Greer</u>, 483 U.S. at 766 n.8.

The jury asked two questions during their deliberations, both unrelated to the burden of proof (CT 136-44), and there is no indication in the record that they were confused regarding the burden of proof, or that they deviated from their instructions as a result of the prosecutor's remarks.  Furthermore, as discussed throughout this Report, the evidence that Petitioner murdered her husband was strong and the evidence of provocation was weak.  Also, as discussed immediately below, this Court reaches the same conclusion as the appellate court, that the prosecutor's misstatement of the law did not rise to the level of a federal constitutional violation.  Thus, in finding there was no "reasonable likelihood" the jury applied the prosecutor's remarks in an objectionable manner, the state appellate court's adjudication of the claim did not involve an objectively unreasonable application of clearly established federal law which requires a showing of a "strong likelihood" that the prosecutor's remarks were devastating to the defense in order to overcome the presumption the jury followed their correct instructions.  <u>Greer</u>, 483 U.S. at 766 n.8.

For the foregoing reasons, and based on the reasoning immediately below regarding why Petitioner has failed to demonstrate a federal due process violation arising from the prosecutor's remarks, the Court finds the appellate court adjudication of this claim did not involve an objectively unreasonable application of clearly established federal law which provides: (1) for a presumption that jurors follow their instructions; (2) that prosecutorial misconduct rises to the level of a federal due process violation only where it denies a defendant the right to a fair trial; or (3) that when a state court finds a federal constitutional violation it must grant relief unless it can declare the error harmless beyond a reasonable doubt.  <u>Andrade</u>, 538 U.S. at 75-76; <u>Williams</u>, 529 U.S. at 405-07; <u>see also</u> <u>Richter</u>, 562 U.S. at 103 ("As a condition for obtaining habeas relief from a federal court, a state prisoner must show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.")  The Court also finds that the state court adjudication was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Miller-El, 537 U.S. at 340.

However, assuming *arguendo* Petitioner is correct that the state appellate court relied on a standard which differs from that required by clearly established federal law, or could otherwise satisfy the provisions of section 2254(d), the Court finds, for the following reasons, that no federal due process violation arose from the prosecutor's misstatements of law.  See Fry, 551 U.S. at 119-22 (holding that even if a petitioner satisfies section 2254(d), or shows it does not apply, she must still demonstrate a federal constitutional violation occurred in order to obtain federal habeas relief.)

**b)  There was no federal constitutional error**

In order to constitute a federal due process violation, prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  Greer, 483 U.S. at 765, quoting Bagley, 473 U.S. at 676.  The alleged misconduct must be reviewed in the context of the entire trial.  DeChristoforo, 416 U.S. at 643.  "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them."  Franklin, 471 U.S. at 324 n.9.  The presumption may be overcome if there is "a strong likelihood that the effect of the [error] would be devastating to the defendant."  Greer, 483 U.S. at 766 n.8.

As the state appellate court correctly observed, the jury was properly instructed on the law with regard to the reduction of murder to manslaughter:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.  [¶]  The defendant killed someone because of a sudden quarrel or in a heat of passion if, one, the defendant was provoked, two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured her reasoning or judgment and, three, the provocation would have caused a person of average disposition to

act rashly and without due deliberation, that is, from passion, rather than from judgment.

(RT 1522.)

The jury was also instructed: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (RT 1507.)

Petitioner testified that the first stab wound she inflicted on Dr. Trayers was in the back of his head, and that she stabbed him intentionally:

> Q. Did you aim for the back of his neck or head, or did that just happen that way?
>
> A. It was the first place I saw skin.
>
> Q. And at this point he is still wearing a shirt?
>
> A. Yes.
>
> Q. What kind of shirt?
>
> A. T-shirt.
>
> Q. And when you say that was the first place you saw skin, were you aiming for a part of his body that had skin showing?
>
> A. Yes. I mean that was the first place I saw skin showing. I don't know why I aimed for skin. I just – it was the first place that he had skin showing because everything else had clothes.

(RT 1397.) Petitioner explained that after the first stab, her husband lay down on the bed for a few seconds holding the back of his head and then got out of the bed and pulled the top sheet and comforter off the bed and out from under her. Petitioner stated that she had no memory of inflicting his other wounds. (RT 1398-1401.)

Forensic evidence showed a large saturation of Dr. Trayers' blood on the pillow and mattress, and a slash in the pillow and mattress. (RT 823.) Blood stain patterns showed Dr. Trayers was lying down with his head on the pillow when the blood saturation began, that a large amount of bleeding took place at that spot, and blood spatter over the headboard and a dresser on the opposite wall may have been cast off from the defensive wounds on his hands. (RT 824-28, 836.) Thus, the forensic evidence conflicted with Petitioner's description of how she killed her husband.

The evidence of provocation provided by Petitioner's testimony also conflicted with the evidence presented at trial.  Petitioner testified that she was upset her husband had been communicating with Dr. Robins for the three months prior to his death, and that she became angry on the morning she killed him because he refused to discuss that topic and made light of her suicide threats.  Although there was evidence that Dr. Trayers was having an affair with Dr. Robins, Petitioner herself had an affair during their marriage, lessening any potential provocation arising from his affair.  Also, her description of Dr. Trayers' behavior that morning was completely out of character from the description of his manner as testified to by witnesses who knew him, including Petitioner.  (RT 1121-24, 1143-44, 1167-68, 1180, 1182, 1207, 1211; Aug CT 218.)  In the eight-page email Petitioner sent to Dr. Robins at 8:23 a.m., just after Petitioner deleted Dr. Trayers' email account and perhaps only minutes before she killed him, Petitioner spoke in the past tense, referenced the sacrifices she had made for her husband, and stated that they had a good marriage but for Dr. Robins' refusal to stop communicating with him.  (RT 1346-48, 1432; Aug CT 84.)  Petitioner's testimony that Dr. Trayers never had his hand on the knife during their struggle, and her testimony that she was stabbed during the struggle, conflicted with forensic evidence that his hand wounds were defensive and her wounds self-inflicted.  Thus, the jury was presented with considerable evidence challenging Petitioner's testimony regarding provocation.  They were also instructed:

> The defendant has been prosecuted for first degree murder under two separate theories; one, the murder was willful, deliberate and premeditated; and two, the murder was committed by lying in wait.  All other murders are of the second degree.  [¶]  Provocation may reduce a murder from first degree to second degree and may reduce a murder to a manslaughter.  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

(RT 1519, 1522.)

In finding Petitioner not guilty of first degree murder but guilty of second degree murder, the jury obviously rejected the lying in wait theory and found she acted without

premeditation.  <u>See</u> <u>Jackson</u>, 443 U.S. at 309 ("Premeditation, or specific intent to kill, distinguishes murder in the first from murder in the second degree; proof of this element is essential to conviction of the former offense, and the burden on proving it clearly rests with the prosecution.")  Nevertheless, the jury did not find the provocation sufficient to reduce the killing from murder to manslaughter.  The Court finds no support in the record that the jury, who deliberated for three full days and had copies of the instructions with them in the jury room, would have found Petitioner not guilty of second degree murder but for the misstatement of law by the prosecutor (which in any case was cured by the jury instructions) that manslaughter required a finding that a person of ordinary disposition would kill or act like Petitioner under the circumstances.  That misstatement of law, when reviewed in the context of the entire trial, which includes not only an unrebutted presumption the jury followed their correct instructions, but a strong forensic challenge to the weak evidence of provocation, was not "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  <u>Greer</u>, 483 U.S. at 765, quoting <u>Bagley</u>, 473 U.S. at 676; <u>DeChristoforo</u>, 416 U.S. at 643.  Accordingly, the Court finds Petitioner has not established a federal due process violation arising from the prosecutor's erroneous comments on the law.

**c) Any error is harmless**

Finally, assuming *arguendo* Petitioner could demonstrate a federal due process violation arising from the prosecutor's misrepresentation of state law, the Court finds any error to be harmless.  Where prosecutorial misconduct rises to the level of a federal constitutional error, federal habeas relief is not available if the error is harmless.  <u>Fields</u>, 309 F.3d at 1109 ("If prosecutorial misconduct is established, and it was constitutional error, we then apply the <u>Brecht</u> harmless error test.")  The <u>Brecht</u> standard "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." <u>Calderon v. Coleman</u>, 525 U.S. 141, 145 (1998) (internal citations and quotation marks omitted). "[A]n error is

15cv0924

harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

As previously discussed, the evidence of provocation was weak and conflicted with the forensic evidence and other testimony presented at trial. To the extent the provocation came from Dr. Trayers' communications with Dr. Robins, Petitioner knew of them for several months before she killed him, and had engaged in a sexual affair of her own, the duration of which she downplayed according to Webb's testimony. To the extent the provocation came from Dr. Trayers' laughing at and taunting her suicide threats, Petitioner's description of his behavior for those few minutes prior to his death is inconsistent with his behavior during their entire marriage, and inconsistent with his character as testified to by every witness who knew him, including Petitioner.

On the other hand, the evidence that Petitioner intentionally killed her husband was strong, including her use of past tense in the email she sent from his email account immediately before she deleted the account, just minutes before she killed him. Petitioner's testimony regarding how she first stabbed him, intentionally in the back of the neck with the military knife as he was reaching for the kitchen knife on the bedside table, conflicted with the forensic evidence that Dr. Trayers was on the bed when attacked. Her testimony that Dr. Trayers pulled the covers off the bed and was standing next to it after only one stab wound conflicted with the forensic evidence that he was stabbed while lying on the bed under the covers, and that the bed was soaked with his blood. Petitioner's testimony that he never had his hand on the knife but only on her wrist while they struggled over the knife, and that she suffered deep stab wounds to her chest during that struggle, conflicted with the testimony of several doctors that he had defensive wounds to his hands and that the majority of her wounds were superficial and self-inflicted.

15cv0924

Thus, Petitioner's testimony regarding provocation conflicted with the physical evidence, described her husband as having acted in a manner inconsistent with his known character, and was premised on her being upset about her suspicion he was having an affair despite her having engaged in an affair of her own.  There is no basis in the record to find that the jury, but for the prosecutor's misstatement of the law, which was cured by the instructions, would have found Petitioner was provoked to the point which "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion, rather than from judgment." (RT 1522.)  The Court is not "in grave doubt about the likely effect of" any error arising from the prosecutor's misstatement of the law.  Padilla, 309 F.3d at 621-22, quoting McAninch, 513 U.S. at 435; see also Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

**3. Conclusion**

The Court finds that judicial economy counsels in favor of addressing the merits of Claim 1 without reaching the procedural default issue.  The also Court finds that the state court adjudication of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court alternately finds that if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), she has not demonstrated that a federal constitutional violation occurred as a result of the prosecutor's misstatement of state law in closing argument, and that even if she could, any such error is harmless.  The Court therefore recommends habeas relief be denied as to Claim 1.

/ / /

**C.     Claim 2**

Petitioner alleges in Claim 2 that her federal constitutional right to due process was violated by the introduction of irrelevant and prejudicial evidence of her long-concluded affair with Webb.  (Pet. at 7.)  Respondent answers that there is no clearly established federal law applicable to this claim, and the state court adjudication therefore cannot be objectively unreasonable under § 2254(d).  (Ans. Mem. at 20-24.)  Petitioner replies that even if there was some slight probative value to Webb's testimony, it was far outweighed by its prejudicial effect.  (Traverse at 6-8.)

The last reasoned state court decision, the appellate court opinion, stated:

> [Petitioner] contends her second degree murder conviction must be reversed because the court deprived her of her federal constitutional rights to due process and a fair trial by erroneously admitting evidence of her marital affair with Webb, which she asserts was irrelevant and prejudicial character evidence that the court should have excluded under Evidence Code sections 1101, 1102, and 352.  This contention is unavailing.
>
> A. *Background*
>
> 1. *[I]n limine motion to exclude evidence of her extramarital affair*
>
> [Petitioner] filed a motion in limine seeking to exclude evidence that she had an extramarital affair with Webb that ended around 2005. [Petitioner] argued that evidence of Dr. Trayers's first affair with Danielle Merket in 2007 should be admitted as it was relevant to her state of mind at the time she killed him "because there is a strong inference that the culmination of (Dr. Trayers's) marital indiscretions provided sufficient provocation for (her) to engage in the killing of her late husband." However, she claimed that evidence of her own affair with Webb should be excluded under Evidence Code section 352 (discussed, *post*) because it was irrelevant and its admission would create substantial danger of undue prejudice.
>
> The prosecutor did not object to admission of evidence of Dr. Trayers's first affair, but argued that evidence of [Petitioner]'s own "lengthy" affair with Webb should be admitted to show the true state of their marriage.  Specifically, the prosecutor argued that in the eight-page letter [Petitioner] e-mailed to Robins, [Petitioner] portrayed herself as a wife who had been dedicated to her husband during their 19–year marriage despite his two affairs, and who had been faithful to him and had supported him at every step.  The prosecutor also argued the letter should be admitted in its entirety because it showed [Petitioner]'s "thought processes, her deliberation, her consideration," and "her manipulation of the truth."  The prosecutor further argued the evidence of [Petitioner]'s affair should be admitted during the People's case-in-chief because the admission into evidence of the eight-page letter "paint(ed) a picture" of a dedicated wife who had sacrificed for her husband, and based on the admission of that evidence [Petitioner] chose not to testify.  The evidence of [Petitioner]'s extramarital affair would show "the truth of this marriage," that "(i)t was not a committed relationship," and there was "a history . . . of rupture in this marriage."

-38-

### a. *First ruling*

The court ruled that evidence of [Petitioner]'s extramarital affair was admissible and should be presented during the prosecution's case-in-chief. The court explained that "trials are about a search for the truth and evaluating both sides, and to paint a picture of . . . the wife who has done everything for the husband and sacrificed everything for him . . . would paint a very misleading picture if the jury were not to be made aware of this problem in her marriage where she had this long-term affair." The court indicated that this evidence should not be kept from the jury—especially when the defense was arguing that evidence of an affair Dr. Trayers had, even before [Petitioner] had her own affair, was relevant—because the jury had to evaluate what was going on in [Petitioner]'s mind when she killed Dr. Trayers and how his relationship with Robins affected her. The court found the evidence of [Petitioner]'s affair was relevant in "impeaching her honesty in the emails" and "impeaching the motivation which she expresses in this lengthy email that she sen(t)" to Robins. However, the court ruled the prosecution could only call as a witness the person (Webb) with whom she had the affair, and he could only testify briefly that he had the affair and the dates of the affair.

### 2. [R]enewed objections to the evidence of her extramarital affair

Defense counsel renewed his objections before Webb testified during the prosecution's case-in-chief. [Petitioner]'s attorney asserted that Webb's testimony was not relevant and requested that Webb "not be allowed to testify under (Evidence Code section) 352." Counsel stated that [Petitioner] would not deny her affair with Webb if asked about it.

In response, the prosecutor argued Webb's testimony was still needed because defense counsel's opening statement indicated that [Petitioner] would testify her affair with Webb was brief and not continuous, and Webb's testimony would be different. Noting that Webb was an out-of-state witness whose availability was limited under the terms of the interstate compact, the prosecutor expressed concern the People would be unable to present Webb's testimony if they had to wait until their rebuttal case. Both the prosecutor and defense counsel acknowledged that [Petitioner]'s testimony was expected to be lengthy.

### a. *Second ruling*

The court reaffirmed its earlier ruling that the prosecution would be allowed during its case-in-chief to present Webb's testimony about his affair with [Petitioner]. The court explained that Webb's testimony "(would) be relatively brief" about an affair that "[Petitioner] really doesn't dispute," and "the (Evidence Code section) 352 aspects of it are very limited." The court stated it was "inclined to allow (Webb) to testify" given that both defense counsel and the prosecutor acknowledged [Petitioner] would be on the witness stand for more than a day, and "we'd lose the ability to have him testify" unless he testified during the prosecution's case-in-chief. The court also observed that the "chances" [Petitioner]'s testimony and Webb's testimony would be identical regarding their affair were "rather remote," and, thus, Webb's testimony "would be coming in legitimately in rebuttal in any event." The court reiterated that the jury needed to hear as much information as possible about what happened during the last 10 years of [Petitioner] and Dr. Trayers's marriage "in order to understand what the

-39-

15cv0924

emotions were and what [Petitioner] was feeling on . . . December 4" when she killed Dr. Trayers.

Shortly thereafter, the prosecution presented Webb's brief testimony (discussed, *ante*) regarding his sexual affair with [Petitioner], which, he stated began around 2002 and ended in late 2004 or 2005.

B. *Applicable Legal Principles*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "(A) trial court has broad discretion in determining the relevance of evidence." (*People v. Smithey* (1999) 20 Cal.4th 936, 973.)

1. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1101, subdivision (b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt, supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, that subdivision provides that nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

2. *Evidence Code section 352*

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine whether the probative value of the evidence is "'substantially outweighed by the probability that its admission (would) . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*Ewoldt, supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.)

The California Supreme Court has explained that "(t)he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '(All) evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.* In applying (Evidence Code) section 352,

1    "prejudicial" is not synonymous with "damaging."'" (*People v. Karis*
     (1988) 46 Cal.3d 612, 638, italics added.)

2

3        3. *Standard of review*

4        We review the trial court's rulings under Evidence Code sections
     1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th
     610, 637.) We will not disturb the trial court's exercise of discretion except

5    upon a showing that it "exercised its discretion in an arbitrary, capricious,
     or patently absurd manner that resulted in a manifest miscarriage of justice."

6    (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

7        C. *Analysis*

8        The court did not abuse its discretion in admitting Webb's testimony
     about his extramarital affair with [Petitioner]. [Petitioner] asserts that

9    Evidence Code section 1101 "codified the rule that protects a defendant
     from being judged guilty of present charges because of . . . her prior acts."

10   (See Evid. Code, § 1101, subd. (a); *Ewoldt, supra*, 7 Cal.4th at p. 393.)
     However, as already discussed, this rule does not prohibit admission of

11   evidence of uncharged prior conduct when such evidence is relevant to
     establish some fact other than the defendant's character or criminal

12   disposition to commit the charged offenses. (Evid. Code, § 1101, subd. (b);
     *Ewoldt*, at p. 393.)

13

14       [Petitioner] claims the court erred in admitting Webb's testimony
     because, although her intent or motive was at issue, this evidence "shed no

15   light on what (her) mental state was" when she killed Dr. Trayers. This
     claim is unavailing. "Evidence of an accused spouse's intimate relations

16   with others is relevant to the state of . . . her marital relationship with the
     victim spouse and, therefore, to motive." (*People v. Houston* (2005) 130

17   Cal.App.4th 279, 307; see also *People v. Gosden* (1936) 6 Cal.2d 14, 25
     (noting that "'(n)o rule is more firmly established than that, upon the trial

18   for murder of husband or wife, evidence tending to show illicit relations of
     the accused with another is admissible to show lack of love or affection for
     the defendant's lawful spouse.'").)

19

20       Here, [Petitioner] placed at issue the state of her marriage with Dr.
     Trayers, and thus her motive in killing him, by arguing that evidence of Dr.

21   Trayers's first affair—with Merket before she had her own affair with
     Webb—was relevant to her state of mind at the time she killed Dr. Trayers.

22   Webb's testimony about his affair with [Petitioner] while she was married
     to Dr. Trayers was relevant to both the state of her marital relationship with

23   Dr. Trayers and her motive at the time she killed him. (See *People v.
     Houston, supra*, 130 Cal.App.4th at p. 307; *People v. Gosden, supra*, 6
     Cal.2d at p. 25.)

24

25       [Petitioner] also asserts "(t)here was nothing to link Webb's
     testimony to what happened to (Dr. Trayers)" because "(i)t . . . said nothing

26   about (her) credibility." This assertion is also unavailing. Evidence Code
     section 1101 does not prohibit admission of evidence of uncharged prior

27   conduct to attack a defendant's credibility. Subdivision (c) of that section
     expressly provides: "Nothing in this section affects the admissibility of
     evidence offered to support or attack the credibility of a witness." (See also

28   *People v. Clark* (2011) 52 Cal.4th 856, 934–935 ("Evidence that defendant
     had sexual contact with women other than (the woman to whom he

considered himself married) during their relationship had some tendency in reason to . . . call his credibility into question.").)

Here, [Petitioner] portrayed herself in the eight-page e-mail she sent to Robins as a wife who had been dedicated to Dr. Trayers over the years and had sacrificed for him despite his two extramarital affairs. Webb's testimony that [Petitioner] had her own affair with him undermined her self-portrayal in that letter and "had some tendency in reason to . . . call (her) credibility into question." (*People v. Clark, supra*, 52 Cal.4th at p. 935.)

In a related a claim, [Petitioner] asserts the Attorney General "offers no authority for presenting 'impeachment' evidence to attack the credibility of evidence ([Petitioner]'s statements in her e-mailed letter)) presented by the prosecution." However, the reporter's transcript of the hearing on [Petitioner]'s motion to exclude Webb's testimony shows the court agreed with the prosecutor's arguments that Webb's testimony should be presented during the People's case-in-chief because (1) defense counsel's opening statement indicated [Petitioner] would testify that her affair with Webb was brief and not continuous, and Webb's testimony would be different; (2) Webb was an out-of-state witness whose availability was limited; (3) [Petitioner]'s testimony was expected to be lengthy; and (4) the prosecution would be unable to present Webb's testimony if it had to wait until its rebuttal case. The court found the chances [Petitioner]'s testimony and Webb's testimony would be identical regarding their affair were rather remote, and, thus, Webb's testimony "would be coming in legitimately in rebuttal in any event." We conclude the court did not abuse its discretion in allowing the prosecution to present Webb's brief testimony during the People's case-in-chief because the record shows he was an out-of-state witness who would have been unavailable to testify as a rebuttal witness following [Petitioner]'s lengthy testimony.

[Petitioner] also contends the court should have excluded Webb's testimony under Evidence Code section 352 because, "(i)f there was any minimal relevance(,) it was outweighed by its prejudicial effect." We reject this contention. Under Evidence Code section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

Here, the reporter's transcript of Webb's brief trial testimony consists of only 10 pages. Webb indicated he met [Petitioner], who was then married to Dr. Trayers, in 2001 or 2002 when he and the Trayers lived in Florida. He testified that he and [Petitioner] worked together, and they eventually had an affair that began around 2002 and became a sexual affair. Webb stated the affair ended in late 2004 or 2005. Webb's testimony was not unduly prejudicial for purposes of Evidence Code section 352 as it did not amount to evidence that "'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis, supra*, 46 Cal.3d at p. 638.)

Last, we reject [Petitioner]'s contention that "(t)he erroneous introduction of unnecessary and inflammatory evidence of an old extramarital affair that contained little or no probative value rendered (her)

15cv0924

1  trial fundamentally unfair, in violation of the Fourteenth Amendment right
2  to due process."  For reasons already discussed, we conclude the court did
   not err.

3  (Lodgment No. 7, <u>People v. Trayers</u>, No. D061564, slip op. at 14-23.)

4      Claims based on state evidentiary rulings are not cognizable on federal habeas
5  unless the admission or exclusion of the evidence was so prejudicial it rendered a trial
6  fundamentally unfair. <u>Estelle v. McGuire</u>, 502 U.S. 62, 70-73 (1991); <u>Ortiz-Sandoval v.</u>
7  <u>Gomez</u>, 81 F.3d 891, 897 (9th Cir. 1996).  The determination by the trial judge that the
8  proffered testimony was relevant is entitled to deference in this Court.  <u>Bradshaw v.</u>
9  <u>Richey</u>, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law
10 . . . binds a federal court sitting in habeas corpus.")  "The issue for us, always, is whether
11 the state proceedings satisfied due process; the presence or absence of a state law
12 violation is largely beside the point." <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20
13 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was
14 conducted in a procedurally fair manner, it is certainly possible to have a fair trial even
15 when state standards are violated; conversely, state procedural and evidentiary rules may
16 countenance processes that do not comport with fundamental fairness.")

17     In the eight-page email Petitioner sent to Dr. Robins at 8:23 a.m., minutes before
18 she killed her husband, Petitioner spoke of him in the past tense, referenced the sacrifices
19 she had made for him, and stated that they had a good marriage but for Dr. Robins'
20 refusal to stop communicating with him.  (RT 1346-48, 1432; Aug CT 84.)  Petitioner
21 testified that: "I was pissed off that he won't talk to me about" the emails and text
22 messages he had exchanged with Dr. Robins.  (RT 1362.)  She said she became angrier
23 than she had ever been in her life when he laughed at her attempts to cut herself.  (RT
24 1372-78.)  Defense counsel argued to the jury that Petitioner was on a 90-day emotional
25 roller coaster from reading those emails and seeing the phone bills with over 500 texts
26 between her husband and Dr. Robins, which led her to contemplate suicide, and that
27 morning when her husband condescendingly replaced their photos on Facebook and
28 offered to show her a better way to kill herself with a better knife, there existed sufficient

provocation for a person of average disposition to act from passion rather than judgment. (RT 1576-1629.)  Because the defense argued Petitioner was provoked by Dr. Trayers' affair and his response to her suicide attempt after he refused to discuss the affair, the state court correctly found Webb's testimony regarding his affair with Petitioner relevant to her state of mind at the time of the killing and to a motive in killing her husband.

Webb's testimony also was relevant to Petitioner's credibility because her testimony conflicted with Webb's.  She testified that the sexual aspect of her relationship with Webb lasted "maybe three or four months" total out of the year and a half their relationship lasted, and that it had been going on for about two months before Webb's wife found out and told Dr. Trayers.  (RT 1202-03, 1210.)  Webb testified, however, that the affair lasted for a year and a half before his wife found out, and that although they took breaks during the affair, those breaks lasted "a week or two" at a time.  (RT 1132, 1136.)  He denied "there was a big gap in time of maybe six or eight months and then the sexual part of it started up again."  (RT 1137.)

Thus, evidence of the affair with Webb was relevant to Petitioner's credibility, to her state of mind at the time of the killing, and to her motive in killing her husband. Furthermore, the prosecutor did not mention the affair during closing argument.  (RT 1527-58, 1634-42.)  Accordingly, the Court finds there is no showing of fundamental unfairness arising from Webb's brief, relevant testimony, the content of which was not highlighted to the jury.  The admission of the evidence was not so prejudicial as to render the trial fundamentally unfair.  McGuire, 502 U.S. at 70-73; Ortiz-Sandoval, 81 F.3d at 897.

The Supreme Court has stated that: "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 102-03 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where

1    there is no possibility fairminded jurists could disagree that the state court decision

2    conflicts with this Court's precedents.")  Applying that standard, the Court finds that the

3    state appellate court's adjudication of Claim 2 is neither contrary to, nor involves an

4    unreasonable application of, clearly established federal law.  Id.; Andrade, 538 U.S. at

5    75-76; Williams, 529 U.S. at 405-07.  The Court also finds the adjudication of this claim

6    is not based on an unreasonable determination of the facts in light of the evidence

7    presented in the state court proceedings.  Miller-El, 537 U.S. at 340.

8         Finally, assuming the introduction of Webb's testimony amounted to a violation

9    of Petitioner's Fourteenth Amendment rights, and further assuming Petitioner could

10   satisfy the provisions of 28 U.S.C. § 2254(d), federal habeas relief is not available if the

11   error is harmless.  See Ortiz-Sandoval, 81 F.3d at 898, citing Dudley v. Duckworth, 854

12   F.2d 967, 972 (9th Cir. 1988).  Petitioner admitted she had an affair with Webb, and as

13   the state appellate court noted, defense counsel's opening statement referenced the affair.

14   Thus, the only possible effect Webb's testimony could have had was in its conflict with

15   Petitioner's description of the duration of the affair, not the fact of the affair.  Even if that

16   peripheral contradiction, which was not highlighted to the jury by the prosecutor, had

17   been viewed by the jury as challenging Petitioner's credibility rather than Webb's, it was

18   an insignificant challenge to her credibility in relation to the fact that nearly every aspect

19   of her testimony regarding how she killed her husband and sustained her own wounds

20   conflicted with the forensic evidence.

21        The Court finds that Webb's testimony did not have had a "substantial and

22   injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

23   The Court is not "in grave doubt about the likely effect of" any error arising from the

24   introduction of Webb's brief, relevant testimony.   Padilla, 309 F.3d at 621-22;

25   McAninch, 513 U.S. at 435; Kotteakos, 328 U.S. at 765.  For all the foregoing reasons,

26   the Court recommends habeas relief be denied as to Claim 2.

27   **D.    Claim 3**

28

Petitioner alleges in her final claim that she was denied her Fourteenth Amendment right to due process because there was insufficient evidence to convict her of any crime greater than voluntary manslaughter.   (Pet. at 8.)   Respondent answers that the adjudication of this claim by the state appellate court, on the basis that sufficient evidence was presented to support a second degree murder conviction, is objectively reasonable. (Ans. Mem. at 24-29.)

The Court will look through the state supreme court's silent denial of this claim to the last reasoned state court opinion, the appellate court opinion, which stated:

> [Petitioner] also contends the evidence is insufficient to support her conviction of second degree murder because no rational trier of fact could have found beyond a reasonable doubt that she killed her husband with malice rather than in the heat of passion; and, thus, there is no substantial evidence she committed any crime greater than voluntary manslaughter. We reject this contention.
>
> A. *Applicable Legal Principles*
>
> 1. *Second degree murder and the heat of passion form of voluntary manslaughter*
>
> "Criminal homicide is divided into two types: murder and manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).)
>
> "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).)   Section 188 defines malice aforethought, which may be either express or implied. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).) "Express malice is an intent to kill. (Citation.) . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)
>
> First degree murder is an unlawful killing with malice aforethought, willfulness, premeditation, and deliberation. (*Chun, supra*, 45 Cal.4th at p. 1181; see also § 189.)   "'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder.'" (*Chun*, at p. 1181.)
>
> "Manslaughter is the unlawful killing of a human being without malice." (§ 192.)   A manslaughter offense is voluntary when the killing is "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)
>
> "Voluntary manslaughter is a lesser included offense of murder." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)   Thus, voluntary manslaughter is a lesser included offense of second degree murder, of which [Petitioner] was convicted in this case.

"The heat of passion requirement for (voluntary) manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The subjective component requires proof that the defendant "actually, subjectively, kill(ed) under the heat of passion." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) The objective or "reasonable person" component of the heat of passion form of voluntary manslaughter requires proof of physical or verbal conduct by the victim that, under the circumstances at the time of the killing, was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59; see also *Beltran, supra*, 56 Cal.4th at p. 942.) Stated differently, the victim's provocative conduct "must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee*, at p. 60.)

"'(I)f sufficient time has ela(ps)ed for the passions of an ordinarily reasonable person to cool, a killing is murder, not (voluntary) manslaughter.'" (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

2. *Standard of review*

When assessing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction or true finding on an enhancement allegation, "unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

B. *Analysis*

Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson, supra*, 26 Cal.3d at p. 578; *Jackson v. Virginia, supra*, 443 U.S. at p. 319), we conclude any reasonable trier of fact could find beyond a reasonable doubt that [Petitioner] acted with malice when she fatally stabbed Dr. Trayers, and that Dr. Trayers's conduct was not "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Lee, supra*, 20 Cal.4th at p. 59.)

1. *Malice*

-47-

Substantial evidence shows [Petitioner] acted with malice by either intentionally killing Dr. Trayers or by acting with a conscious disregard for his life while knowing she was endangering his life. (See *Chun, supra*, 45 Cal.4th at p. 1181.) [Petitioner]'s own testimony establishes that the first stabbing wound she inflicted was to the back of Dr. Trayers's neck and that she intentionally aimed at that part of his body. Specifically, [Petitioner] testified she stabbed him "the first time" with the military knife "in the back of the neck." Her trial counsel then asked her, "Did you aim for the back of his neck or head, or did that just happen that way?" [Petitioner] replied, "It was the first place I saw skin." Her counsel then asked her, "And when you say that was the first place you saw skin, were you *aiming* for a part of his body that had skin showing?" (Italics added.) [Petitioner] answered, "Yes."

In addition, undisputed medical expert testimony established that [Petitioner] stabbed Dr. Trayers numerous times in vital parts of his body, including twice in the chest and eight times in the back. One of the chest wounds, which was two and a half inches deep, went through the heart and the right lung. The other chest wound, which was three and a half inches deep, went through the left lung. One of wounds in the back went into the chest cavity, another entered the abdomen and cut into the right kidney, and another went through the left kidney.

Any rational trier of fact could find beyond a reasonable doubt that, because [Petitioner] specifically and intentionally "aimed" her first strike with the knife at the back of Dr. Trayers's neck, she also intentionally aimed the subsequent knife strikes to the chest and back in such a way that they would cut through vital organs. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 ("In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill.").) [Petitioner] did claim in her testimony that she suddenly "black(ed) out" after she stabbed Dr. Trayers in the neck and that she had no memory "whatsoever" of stabbing him multiple times in the chest and back. She also indicated that she and Dr. Trayers had taken an equal dose of Ambien, which is a sleep medication, before she attacked him with the knife. [Footnote: [Petitioner] testified that Dr. Trayers crushed more than one Ambien pill, put the medication in orange juice, and they each drank half. Expert testimony established that the amount of this drug later found in Dr. Trayers's system was within the normal therapeutic range for a single dose. The foregoing substantial evidence supports a finding that, like Dr. Trayers, [Petitioner] only took a single dose.]

However, [Petitioner]'s own testimony shows she was not feeling any effects from the Ambien during the struggle for the military knife she was holding immediately before she stabbed Dr. Trayers in the neck. Specifically, after [Petitioner] testified about that struggle, her counsel asked her, "And at this point . . . do you recall whether you were feeling the effects of the Ambien or not?" [Petitioner] replied, "I don't recall that I am." In her testimony, [Petitioner] indicated she blacked out almost immediately after she stabbed Dr. Trayers in the neck. However, in finding [Petitioner] killed Dr. Trayers with malice aforethought and she was guilty of second degree murder, the jury found her testimony was not credible. The foregoing substantial evidence supports the jury's findings, and we will not reevaluate [Petitioner]'s credibility as a witness. (See *People v. Ochoa*, supra, 6 Cal.4th at p. 1206 ("'(I)f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.'").)

15cv0924

The prosecution presented additional substantial evidence that supports the jury's findings that [Petitioner] killed Dr. Trayers with malice and her testimony was not credible. Expert witness testimony established that the multiple incised wounds to Dr. Trayers's hands were consistent with defensive wounds that were inflicted as he was attempting to block or grab the knife to defend himself, [Petitioner]'s knife wounds, most of which were superficial, were self-inflicted, and she had no wounds of self-defense.

Also, as discussed in greater detail in the factual background, *ante*, substantial evidence showed that a large saturation of Dr. Trayers's blood was found on the pillows, sheets, and mattress on his side of the bed; the pillows, as well as the sheets that had been over and under Dr. Trayers, were slashed; and a blood spatter expert found the blood evidence was consistent with Dr. Trayers's having been stabbed while he was lying on the bed under the bedding. From this evidence any rational trier of fact could find beyond a reasonable doubt that [Petitioner] stabbed Dr. Trayers while he was in bed trying to sleep and that she was not credible when she testified that he stepped out of bed and pulled the flat sheet and comforter off the bed before she inflicted the fatal stab wounds.

That [Petitioner] acted with malice is also circumstantially shown by the eight-page letter she e-mailed to Robins on the morning of the killing, in which she wrote, "I was the last person he was with." A rational jury could infer from this statement referring to Dr. Trayers in the past tense that [Petitioner] harbored the intent to kill him.

For all of the foregoing reasons, we reject [Petitioner]'s contention that no rational trier of fact could have found beyond a reasonable doubt that she killed her husband with malice.

## 2. *Heat of passion*

We also reject [Petitioner]'s contention that there is no substantial evidence she committed any crime greater than voluntary manslaughter because "(n)o reasonable juror could conclude that the situation was not one in which an ordinary person could be provoked to act rashly, from passion rather than judgment."

As already discussed, voluntary manslaughter is a lesser included offense of second degree murder. (See *People v. Cole, supra*, 33 Cal.4th at p. 1215.) We begin our analysis by noting that "'(i)n deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury.'" (*People v. Manriquez*, supra, 37 Cal.4th at p. 585, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162.) Thus, we will not disturb the jury's implied determination that [Petitioner] was not a credible witness.

We conclude the evidence of provocation is insufficient to satisfy the objective or "reasonable person" component of the heat of passion form of voluntary manslaughter, which requires proof that [Petitioner]'s heat of passion resulted from conduct on the part of Dr. Trayers that, under the circumstances at the time [Petitioner] killed him, was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee*, supra, 20 Cal.4th at p. 59.) [Petitioner] did not learn about Dr. Trayers's extramarital affair with Robins on or shortly before the day of the stabbing.

15cv0924

Substantial evidence shows she learned about the affair in October, almost two months before she killed him in early December.  Specifically, [Petitioner] testified that she installed spyware software on their home computer and Dr. Trayers's laptop in early October that allowed her to read what he was communicating by e-mail.  She indicated she read one e-mail from Robins in mid-October that referred to Dr. Trayers as "Mr. Wonderful," which [Petitioner] interpreted to mean he was with Robins exclusively.

The evidence also shows that in late November or early December, Dr. Trayers told Robins a false story that [Petitioner] was pregnant, and Robins told him they would have to end the affair.  In her testimony, [Petitioner] acknowledged that she deduced from the e-mails she was surreptitiously reading that Dr. Trayers's relationship with Robins was ending and Dr. Trayers had told Robins they could not see each other anymore.  The foregoing evidence supports a reasonable inference that Dr. Trayers had falsely told Robins that [Petitioner] was pregnant as an excuse to end his relationship with Robins and stay with [Petitioner].

In her testimony, [Petitioner] claimed that Dr. Trayers laughed at her when she put the blade of the butcher knife against her wrist and that she believed from Dr. Trayers's reaction after she subsequently started poking her wrist harder with the military knife that he thought her behavior was funny.  Even if we were to assume the jury found this testimony credible, Dr. Trayers's responses to [Petitioner]'s escalatingly provocative behavior were not sufficiently provocative that they would cause an ordinary, sober person of average disposition under the circumstances to become "so inflamed that . . . she would lose reason and judgment" (*People v. Lee*, supra, 20 Cal.4th at p. 60) and "act rashly or without due deliberation and reflection" (*id.* at p. 59).

(Lodgment No. 7, <u>People v. Trayers</u>, No. D061564, slip op. at 23-32.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 324.  The Court must apply an additional layer of deference to the state appellate court opinion in applying the <u>Jackson</u> standard.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  <u>Richter</u>, 562 U.S. at 103, quoting <u>Jackson</u>, 443 U.S. at 332 n.5.

As the state court correctly observed, the evidence presented at trial provided a strong case for murder and a weak case for manslaughter. Evidence that Dr. Trayers was attacked while lying in his bed was supported by the blood spatter and soak patterns, and by the slashes in the mattress and pillow on his side of the bed which were similar to the slashes in his shirt. Yet Petitioner testified she first stabbed Dr. Trayers in the back of his neck while he was leaning over to pick up the kitchen knife off a bedside table, that he lay down only briefly before he stood up next to the bed and pulled the bedding off, and that she then apparently inflicted the rest of his wounds, although she said she did not remember doing so. Her testimony in that regard conflicted with the blood spatter and soak evidence, and the fact that the kitchen knife was found intertwined in rather than underneath the bedding wrapped around Dr. Trayers' lower body.

Petitioner's testimony describing the struggle over the knife, that her husband only grabbed her wrist and never the knife, is inconsistent with the defensive wounds to his hands. Her testimony that he laughed at and taunted her about her intent to commit suicide is inconsistent with the nature of his personality as testified to by herself and every witness who knew him. Her testimony that she was upset about his affair was contradicted by evidence that she also had an affair during the marriage, as well as evidence that she was aware that he had lied to Dr. Robins about Petitioner being pregnant as an excuse to end their affair. Thus, the evidence of provocation presented by Plaintiff's testimony conflicted with much of the evidence presented at trial.

The state appellate court also correctly observed that the evidence regarding the nature of the wounds suggested an intent to kill. Forensic evidence suggested the two stab wounds to Dr. Trayers' chest were inflicted while he lay under the bedding, that they penetrated his heart and lung, and might have been almost instantly fatal. (RT 249-50.) The stab wounds to his back broke ribs and penetrated his kidneys, and the doctor who performed the autopsy could not say with complete certainty whether they were or were not inflicted postmortem. (RT 265-66.) Petitioner argues here (Traverse at 5), as her defense counsel argued to the jury at trial (RT 1570), that the brutality of the wounds and

the possibility that many were postmortem suggests rage and a lack of reasoned judgment rather than an intent to kill.  However, Petitioner's testimony that she received several stab wounds to her chest during the struggle over the knife is inconsistent with the testimony of two doctors who opined her injuries were self-inflicted and mostly superficial.  (RT 994, 1084.)

Thus, even accepting as true Petitioner's contention that her testimony provided evidence consistent with manslaughter and inconsistent with murder, the jury could reasonably have rejected her testimony regarding provocation in light of the strong physical and forensic evidence which challenged her credibility and suggested an intent to kill.  See Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality."); Schlup v. Delo, 513 U.S. 298, 330 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review.")  Moreover, as discussed throughout the state appellate opinion and this Report and Recommendation, there was overwhelming evidence supporting the jury's verdict.

In light of the additional layer of deference this Court must give to the state appellate court opinion in applying the Jackson standard, it is clear that Petitioner has not shown that her federal due process rights were violated due to insufficient evidence to support the jury's verdict of second degree murder.  Juan H., 408 F.3d at 1274.  She has failed to show that based on the "evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" of any crime greater that voluntary manslaughter.  Jackson, 443 U.S. at 324.  Accordingly, the Court recommends habeas relief be denied as to Claim 3.

## VI.
## CONCLUSION AND RECOMMENDATION

15cv0924

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgement be entered denying the Petition.

**IT IS ORDERED** that no later than **May 20, 2016** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **June 10, 2016**. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  April 29, 2016

BARBARA L. MAJOR
United States Magistrate Judge

15cv0924