1
2
3
4
5
6
7
8
9
10
11

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

12

JENNIFER TRAYERS,

13
                                    Plaintiff,

14

15  v.

16

17  DEBORAH K. JOHNSON, Warden,
    et al.,

18
                                    Defendant.

19

20

21

Case No.:  15-cv-00924-H-BLM

**ORDER:**

**(1) DENYING PETITION FOR
WRIT OF HABEAS CORPUS;**

[Doc. No. 1]

**(2) ADOPTING REPORT AND
RECOMMENDATION; AND**

[Doc. No. 15]

**(3) DENYING CERTIFICATE
OF APPEALABILITY**

22         On April 20, 2015, Petitioner Jennifer Trayers, a state prisoner proceeding pro se,

23  filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging her

24  state court conviction for second degree murder.  (Doc. No. 1.)  On January 14, 2016,

25  Respondent filed a response to the petition.  (Doc. No. 12.)  On February 8, 2016, Petitioner

26  filed a traverse.  (Doc. No. 14.)  On May 10, 2016, the magistrate judge issued a report and

27

28

1

recommendation recommending that the Court deny the petition.  (Doc. No. 15.)  After careful consideration, the Court denies Petitioner's petition for writ of habeas corpus and adopts the magistrate judge's report and recommendation.

**Background**

I.    **Factual History**

The Court adopts the facts from the California Court of Appeal's opinion denying Petitioner's direct appeal and affirming her conviction.  (<u>See</u> Doc. No. 13-18, Lodgment No. 7.)  This Court, pursuant to 28 U.S.C. § 2254(e)(1), presumes the following relevant facts to be true:

A. *The People's Case*

Dr. Trayers was an emergency medicine physician at the Balboa Naval Medical Center in San Diego.  When Jennifer killed him on December 4, 2010, they had been married for 18 years.

1. *Stabbing death of Dr. Trayers*

After he attended a holiday party on the night of December 3, Dr. Trayers worked a night shift at the Balboa Naval Hospital until 6:00 o'clock the next morning.  He was next scheduled to work at 11:00 a.m. on Sunday, December 5, and coworkers became worried when he did not come to work. They began attempting to reach him by phone on Sunday evening.  Friends went to the Trayers' home, and, although both of the Trayers' cars were there, they saw no sign of anything out of the ordinary other than that the Trayers were not at home.  Coworkers called police late Sunday night.

Police officers went to the Trayers' home on Sunday night to conduct a welfare check, but observed that everything was quiet.  Officers returned the next morning, December 6, and one of them looked through a window into a bedroom and saw a female (Jennifer) lying face up on the floor, with her clothing covered in blood, next to the left (or east) side of the bed (viewing the scene from the foot of the bed).

The officers forcibly entered the Trayers' home and found that Jennifer was barely alive with what were later determined to be self-inflicted knife wounds.  A military-style knife with a blade about seven inches in length was found on the floor under the edge of the left (east) side of the bed very close to where Jennifer was found.

2

Dr. Christina Stanley, a forensic pathologist who examined Jennifer in the hospital, testified that Jennifer had suffered about three dozen stab wounds or sharp force injuries primarily over a small area of her chest, many of which were superficial, and she had lost a significant amount of blood and was in shock.  Her most significant injury was to an artery in the wall of her abdomen, but the wound did not go inside her abdomen.

Dr. Michael Sise, a vascular surgeon and trauma medical director at Scripps Mercy Hospital who treated Jennifer's multiple knife wounds, opined that the wounds were self-inflicted.  Dr. Sise explained that he found no wounds of self-defense, which are usually on the hands.  He also explained that the multiple wounds in the central area of Jennifer's chest were "hesitation marks," a term that trauma surgeons use to describe superficial wounds that may have penetrated the skin but had not penetrated deeply.

The police officers who entered the Trayers' home found Dr. Trayers dead and face down on the floor on the right (or west) side of the bed—opposite where Jennifer was found on the floor on the left side of the bed—in a fetal position facing the bed and leaning against the side of the bed with the bedding around his lower extremities.  The bedding around Dr. Trayers's body, as well as the pillows and the fitted sheet on the bed in the area near the headboard, were cut.  A kitchen or chef's knife was found near Dr. Trayers's left calf under the bedding.  He had a strand of hair—later determined to be Jennifer's—in his left hand.

According to a deputy medical examiner for the County of San Diego who examined Dr. Trayers's body at the scene of the killing, Dr. Trayers had suffered numerous stab wounds: two in the chest, six in the back, one in the back of the head, one in the right forearm, one on the tip of the right index finger, one on the tip of the right middle finger, and another by the left thumb. One of the chest wounds, which could have been a fatal wound, went through the heart and the right lung.  The multiple superficial incised wounds to Dr. Trayers['s] hands were consistent with defensive wounds inflicted as he was attempting to block or grab the knife.

A large saturation of Dr. Trayers's blood was found on the pillows, sheets, and mattress on Dr. Trayers's right (west) side of the bed, and his blood spatter was on the west side of the headboard, the wall, and the nightstand on his side of the bed.  A blood spatter expert found the blood evidence was consistent with Dr. Trayers's having been stabbed while lying on the bed under the bedding, having flung a hand that was cut from the palm to the forearm, and having moved and ended up on the floor where the officers found

3

him with the bedding (a comforter and sheet) around him.

The results of forensic toxicology testing indicated the presence of Zolpidem, a prescription sleep aid, in both Jennifer's system and that of Dr. Trayers. The amount in Dr. Trayers'[s] system was within the normal therapeutic range for a single dose. Zolpidem is commonly used by emergency physicians as a sleep aid because they work different shifts and sometimes have trouble falling asleep. One empty bottle of Zolpidem, which had been prescribed for Dr. Trayers, was found on the left side of the bed within three or four feet of the military-style knife in the area where Jennifer was found, and another nearly empty bottle was found in a medicine box.

Three of four stacked manila envelopes found on a shelf near the Trayers' kitchen contained 218 pages of printouts of screen captures and numerous text messages to and from Dr. Trayers's phone, e-mails, and photographs of Dr. Trayers. Most of the documents were correspondence between Dr. Trayers and Danielle Robins (discussed, *post*) discussing how much they loved each other and their future plans together. There was also a lengthy e-mail from Jennifer to Robins.

2. *Dr. Trayers'[s] relationship with Danielle Robins and the events culminating in his death*

Robins testified that she met Dr. Trayers in August 2010 on a Mercy-class hospital ship when she was a medical student, and they developed a friendship. They both returned to San Diego County after their journey on the ship. Robins eventually started an emergency room rotation at Balboa Naval Medical Center where Dr. Trayers worked, and they began to have an affair at the end of September. They exchanged numerous e-mail and text messages in which they expressed their love for each other.

During this same time period, Dr. Trayers and Jennifer attended marriage counseling, and Dr. Trayers was conflicted about whether he should continue his affair with Robins. In late November or early December, he told Robins a false story that Jennifer was pregnant, and Robins told him they would have to end the affair. Unbeknownst to Dr. Trayers and Robins, Jennifer was reading their e-mail communications.

Early in the morning on December 4, Dr. Trayers texted Robins, who was in Maryland, that he had finished his shift and had about 30 minutes of dictation to complete. At around 7:15 a.m., Dr. Trayers, who was at home, sent his last text message to Robins telling her he was going to sleep. He took some Zolpidem to help him sleep.

About an hour later, Jennifer replaced her husband's photographs on Facebook with photos of themselves in happier times. Shortly thereafter, using her husband's e-mail account, Jennifer sent Robins two e-mails with attachments, one of which was a lengthy eight-page letter written by Jennifer and addressed to "Little Miss Grass is Not Greener on My Side." In her letter, Jennifer accused Robins of having ruined her husband's marriage, career, and future. Jennifer wrote, "I was the last person he was with."

Within minutes of sending the e-mail to Robins, Jennifer deleted Dr. Trayers's Gmail account. On a shelf near the kitchen, Jennifer left manila envelopes containing copies of her e-mailed letter to Robins and e-mails between Dr. Trayers and Robins. It is undisputed that Jennifer killed Dr. Trayers that morning with a knife.

3. *Additional evidence*

Jennifer's mother, Deborah Smith, testified that she spoke with Jennifer by telephone on the morning of December 4 right after she texted Jennifer at around 9:00 a.m. Jennifer told her she and Fred (Dr. Trayers) were sleeping in.

a. *Evidence of Jennifer's extramarital affair*

Orvill Webb testified he met Jennifer in Florida in 2001 or 2002, and they [had] a sexual affair that began around 2002 and ended in late 2004 or 2005.

B. *Defense Case*

Jennifer testified on her own behalf. She and Dr. Trayers, who was in the Navy training to be a pilot, met in 1991 and married in 1992. In 1997, they moved to Fallon, Nevada, so Dr. Trayers could teach at the Top Gun flight school. In Fallon, Dr. Trayers met Danielle Merket, a civilian who was conducting some sort of psychological research on pilots. The two continued to have contact after Merket left Fallon.

Jennifer testified that she and her husband moved to Fort Lauderdale in 2001, and her husband started medical school. Dr. Trayers contacted Merket, who lived in Orlando, and they started spending time together. Jennifer eventually became convinced they were having an affair.

Jennifer began to have a sexual relationship with Webb in early 2003 because she was upset her husband was in love with Merket and felt their marriage was over. Dr. Trayers learned about the relationship a couple months after it started and blamed himself for not paying attention to Jennifer

15-cv-00924-H-BLM

and not being home.  The couple stayed together, but the marriage was under strain.

Jennifer testified that when they moved from Florida to San Diego in 2005, they agreed to put the affairs behind them and renewed their vows in 2007 on their 15th anniversary.  Jennifer became angry when she caught Fred e-mailing Merket late in 2007, but she remained in the marriage.  She testified that her relationship with Dr. Trayers from early 2010 to early August of that year was good, there was never a time when she used physical violence against him, and he did not use physical violence against her.

Jennifer testified that when Dr. Trayers returned from the Mercy ship cruise in early September, she became suspicious over the amount of time he spent sending text messages to someone else on his phone.  She became anxious because she felt something was wrong and started losing weight and not sleeping.  The couple began going to counseling in late September, but Dr. Trayers continued to deny anything was happening.

Jennifer stated she installed spyware software on their home computer and Dr. Trayers's laptop in early October that allowed her to see what he was communicating by e-mail.  The first e-mail she read was from Dr. Trayers to another woman about what he had done with her that day.  She mistakenly thought Dr. Trayers was communicating with Danielle Merket.  Jennifer testified she felt sick when she read that e-mail, and she began to print the e-mails.  She confronted Dr. Trayers in mid-October about the hundreds of text messages the phone bill showed he had sent to a phone number in Maryland, and he told her he was simply helping a medical student (Danielle Robins) in Maryland.

Jennifer testified she read one e-mail from Danielle Robins that called Dr. Trayers "Mr. Wonderful" and suggested he was with Robins exclusively.  Jennifer started feeling better when she deduced from the e-mails that Dr. Trayers's relationship with Robins was ending, but then in late November she saw one informing Dr. Trayers that Robins was returning to Camp Pendleton.  Jennifer testified she continued feeling anxious and losing weight.  In late November, Dr. Trayers removed photos of the two of them from his Facebook page.

The eight-page e-mail that Jennifer sent to Robins was actually a journal Jennifer began in October.  She testified she made her last entry on December 1.  She made no entry on the morning of December 4.  She stated that when she wrote her entries—such as, "I will have the joy of knowing I

6

got to spend quality time with him," and "I got to see him every day," which she acknowledged seemed to be in the past tense—she had no plan to kill her husband, but was considering suicide.  By the end of November, she was sleeping only one or two hours a night.

Jennifer also testified that on December 3, before Dr. Trayers left for the holiday party and then work, he sat down on the couch with her and told her he would never leave her and that he wanted to start being honest with her and communicating more.  Jennifer wanted him to admit his affair with Robins, but did not confront him about it because she had not told him she was reading his e-mail.  She did not sleep at all that night; she was awake worrying about their relationship.

Dr. Trayers came home from work at around 7:30 a.m. (Dec. 4), and talked about the Christmas party the night before.  He said there would be pictures from it on Facebook.  Jennifer said to him, "Speaking of Facebook," and asked what had happened to the missing photos of the two of them on his Facebook page.  Jennifer testified he claimed he did not know what she was talking about, and she became angry that he was "playing dumb."  They went to the computer and Dr. Trayers pretended he did not know how the pictures had disappeared.  He posted some pictures of the two of them, and said, "Now are you happy?" in a voice that sounded like he was disgusted with her.

Jennifer testified that, while Dr. Trayers was in the bathroom, she stayed at the computer and found 12 to 15 new e-mails that she believed were from Robins and deleted all of them without reading them.  She then sent an e-mail to Robbins from Dr. Trayers's account with photos attached showing him wearing his wedding ring.  She also sent screen prints of pornography and herpes Web sites Dr. Trayers had visited.  Finally, in a second e-mail, Jennifer pasted the journal she had been keeping and sent it as the eight-page e-mail to Robins using Dr. Trayers's account.

According to Jennifer, when Dr. Trayers came out of the bathroom she repeatedly asked him to talk to her about what he had said the night before, about being honest and communicating more.  Dr. Trayers told her to calm down, said they should first take a nap, and told her they should both take Ambien and get some sleep.  During this time, Dr. Trayers received a phone call he said was from a Virginia area code, and Jennifer assumed it was Robins.  Dr. Trayers let the call go to voice mail.

Jennifer testified that Dr. Trayers crushed more than one Ambien pill, put them in orange juice, and they each drank half.  She did not know how

many Ambien pills he put in the juice.  She became increasingly anxious and angry, and Dr. Trayers kept saying he wanted to take a nap before talking. Jennifer retrieved the manila envelopes in which she had been keeping the e-mails and other documents and showed them to Dr. Trayers, who shook his head and said that he did not want to see them, he was going to bed to read, and they could talk after lunch.

Jennifer testified she became [angrier], went to the kitchen, slammed down the envelopes, and grabbed a butcher knife.  She thought if she threatened to hurt herself she would get him to talk to her.  She took the knife into the bedroom where Dr. Trayers was lying on the right side (as viewed from the foot of the bed), got into the middle of the bed by his right arm, held the blade of the knife to her wrist, and asked him whether that was the way to cut her wrists.  She had no intention to kill or hurt Dr. Trayers, but assumed he would stop her if she tried to hurt herself.  He started laughing at her.  Dr. Trayers told her the butcher knife was not sharp enough, and then reached down and opened the bottom drawer of the nightstand to show her his military knife.  Jennifer testified she jumped over him and grabbed it, put the butcher knife on the nightstand, and returned to the middle of the bed.  Jennifer put the military knife against her left wrist and again asked him how to hold the knife to cut her wrist.  Dr. Trayers told her that, if she wanted to kill herself, she needed to cut an artery that ran down her arm, and she started poking at that artery with the knife.

According to Jennifer's testimony, Fred did not respond, and she grew angrier.  She poked herself harder and started to bleed and from Dr. Trayers'[s] reaction she believed he thought it was funny.  Jennifer held the knife to her chest and asked where she should stab herself, and he said, "Lower."  Jennifer testified she became angrier than she had ever been.

Jennifer, while still being questioned by her counsel on direct examination, testified that Dr. Trayers, using his left hand, grabbed her wrist to try to take the knife from her.  She also stated that Dr. Trayers was right-handed, and he used his left hand because she was kneeling on his right hand. Jennifer testified she did not intentionally kneel on his right hand to pin it down.

Jennifer's counsel asked her, "And at this point right as he starts to grab toward the knife, do you recall whether you were feeling the effects of the Ambien or not?"  Jennifer replied, "I don't recall that I am."

15-cv-00924-H-BLM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

       Jennifer indicated she and Dr. Trayers started wrestling when she was still on top of his right hand, but he got his right hand out from under her, and then they struggled over the knife.  During the struggle, the knife remained pointed in Jennifer's direction even though her arms were swinging.  To force Dr. Trayers to release his grip on her right wrist, Jennifer leaned over him and banged his left arm on the side of the mattress.  She testified that, even though Dr. Trayers was stronger, she was able to free her wrist from his grip.  Dr. Trayers then sat up and reached with his right hand for the butcher knife on his nightstand.  Jennifer testified that Dr. Trayers touched the handle of the knife, and she stabbed him with the military knife in the back of the neck because "[i]t was the first place I saw skin" and she aimed for it.  The butcher knife fell to the floor.

       Dr. Trayers then stood up by the nightstand, facing her and pulling the comforter and flat sheet from underneath her.  Jennifer testified that Dr. Trayers bent down and then she blacked out.  She stated she did not remember stabbing Dr. Trayers a second time, and she had no memory of stabbing him multiple times in the chest and back.  Jennifer also testified she did not specifically intend to kill her husband that morning, and she never thought that morning that she was so jealous of his seeing Robins that she wanted him dead.

15

16

17

(Doc. No. 13-18, Lodgment No. 7 at 3–14 (footnotes omitted).)  In addition, the Court adopts the detailed discussion of the evidence presented at Petitioner's trial set forth in the magistrate judge's report and recommendation.  (Doc. No. 15 at 3–17.)

18

## II.   Procedural History

19

20

21

22

23

       On February 8, 2012, a jury convicted Petitioner of second degree murder in violation of California Penal Code § 187(a), and returned a true finding on the allegation that she used a deadly weapon within the meaning of California Penal Code § 12022(b)(1).  (Doc. No. 13-11, Lodgment No. 2-2 at CT 146.)  The trial court sentenced Petitioner to sixteen years to life.  (Doc. No. 13-12, Lodgment No. 2-3 at CT 163.)

24

25

26

       Petitioner appealed her conviction, arguing that: (1) the trial court erroneously admitted evidence of Petitioner's extramarital affair with Webb at trial; (2) the evidence presented at trial was insufficient to support a conviction of any crime greater than

27

28

9

15-cv-00924-H-BLM

voluntary manslaughter; and (3) the prosecutor committed prosecutorial misconduct by misstating the law during closing arguments.  (See Doc. No. 13-15, Lodgment No. 4.)  On January 31, 2014, the California Court of Appeal rejected Petitioner's arguments on the merits and affirmed the judgment.  (Doc. No. 3-18, Lodgment No. 7.)  Petitioner then filed a petition for review in the California Supreme Court raising the same claims.  (Doc. No. 3-19, Lodgment No. 8.)  On April 16, 2014, the California Supreme Court summarily denied the petition in an order stating: "The petition for review is denied."  (Doc. No. 3-20, Lodgment No. 9.)

On April 20, 2015, Petitioner timely filed a federal habeas petition before this Court, alleging violations of her constitutional rights on the same three grounds as raised in her direct appeal.  (Doc. No. 1 at 6–8.)  On January 14, 2016, Respondent filed a response to the petition.  (Doc. No. 12.)  On February 8, 2016, Petitioner filed a traverse.  (Doc. No. 14.)  On May 10, 2016, the magistrate judge issued a report and recommendation recommending that the Court deny the petition.  (Doc. No. 15.)

<u>**Discussion**</u>

**I.    Legal Standards for 35 U.S.C. § 2254 Habeas Petition**

A federal court may review a petition for writ of habeas corpus by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); accord Swarthout v. Cooke, 562 U.S. 216, 219 (2011) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)) (internal quotation marks omitted)).  "Habeas corpus is an 'extraordinary remedy' available only to those 'persons whom society has grievously wronged . . . .'"  Juan H. v. Allen, 408 F.3d 1262, 1270 (9th Cir. 2005) (quoting Brecht v. Abrahamson, 507 U.S. 619, 633–34 (1993)).  Because Petitioner filed the present petition after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the petition.  See

10

Lindh v. Murphy, 521 U.S. 320, 322–23 (1997); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc).

Under AEDPA, a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Pinholster, 563 U.S. at 181 (citations omitted). "Section 2254(d) thus demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state court; if it has, AEDPA's highly deferential standards kick in." Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015). "The petitioner carries the burden of proof." Pinholster, 563 U.S. at 181.

Under § 2254(d)(1), a federal court may grant habeas relief only if the state court's decision was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Supreme Court has explained that "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.'" Bell v. Cone, 535 U.S. 685, 694 (2002); see Williams v. Taylor, 529 U.S. 362, 404–05 (2000) (distinguishing the "contrary to" and the "unreasonable application" standards). "A state-court decision is 'contrary to' [the Supreme Court's] clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different

11

15-cv-00924-H-BLM

from our precedent.'" <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06). A state court decision is "an unreasonable application" of the Supreme Court's clearly established precedent if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 407. Under the "unreasonable application" prong, "the state court's decision must have been more than incorrect or erroneous." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003). The state court's application of the relevant precedent must have been objectively unreasonable. <u>Id.</u>; <u>Lockyer v. Andrade</u>, 538 U.S. 63, 76 (2003); <u>see also</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" <u>Lockyer</u>, 538 U.S. at 71; <u>accord</u> <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44 (2011); <u>see also</u> <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"). Further, "review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Pinholster</u>, 131 S. Ct. at 1398.

Under § 2254(d)(2), a federal court may grant habeas relief only if the state court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under this provision, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558

U.S. 290, 301 (2010) ("[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"). "Instead, § 2254(d)(2) requires that [the federal habeas court] accord the state trial court substantial deference." Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015).

In conducting an analysis under AEDPA, the federal habeas court looks to the last reasoned state-court decision. Castellanos v. Small, 766 F.3d 1137, 1145 (9th Cir. 2014); Murray v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014). Where there is an unexplained decision from the state's highest court, the federal habeas court "looks through" to the last reasoned state court decision and presumes that the unexplained opinion rests upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 801–06 (1991); see, e.g., Brumfield, 135 S. Ct. at 2276. Where no state-court decision furnishes a basis for the state court's underlying reasoning, the court must engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable. Castellanos, 766 F.3d at 1145; see also Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

In addition, even if a federal habeas petitioner has established that a constitutional error occurred, the petitioner is not entitled to habeas relief based on a trial error unless the petitioner can establish that the error "resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637; accord Ayala, 135 S. Ct. at 2197. "Under that standard, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116 (2007) (internal quotation marks and citation omitted). Further, "[t]here must be more than a 'reasonable possibility' that the error was harmful." Ayala, 135 S. Ct. at 2198.

15-cv-00924-H-BLM

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3). If a party objects to any portion of the magistrate's report, the district court reviews de novo those portions of the report. Id.; see also United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." (emphasis in original)).

## II.   Petitioner's Prosecutorial Misconduct Claim

As the first ground of her habeas petition, Petitioner alleges that the prosecutor's misstatement of the law at closing argument violated her due process rights.[1] (Doc. No. 1 at 6.) Petitioner contends that the prosecutor misstated the law on the provocation element required to mitigate the offense from second degree murder to voluntary manslaughter, in violation of her due process rights. (Id.) Petitioner also argues that the California Court of Appeal applied the wrong harmless error standard when reviewing this claim on appeal. (Id.)

This claim was raised on direct appeal and denied by the state courts. (See Doc. Nos. 13-17, 13-18, 13-19, 13-20, Lodgment Nos. 6, 7, 8, 9.) Thus, in conducting the habeas review, the Court looks through the California Supreme Court's summary denial of Petitioner's petition for review and evaluates the California Court of Appeal's reasoned decision denying Petitioner's prosecutorial misconduct claim. See, e.g., Brumfield, 135 S. Ct. at 2276. The California Court of Appeal's opinion provided the following background

---

[1]   Respondent argues that Petitioner's prosecutorial misconduct claim is procedurally barred from habeas review due to her failure to object at trial. (Doc. No. 12-1 at 9–10.) However, a state court's judgment on the merits despite procedural defaults lifts any bar to federal habeas reviews. See Ylst, 501 U.S. at 801. The California Court of Appeal exercised its discretion to adjudicate the claim on the merits despite Petitioner's failure to object at trial because it involved an important question of constitutional law. (Doc. No. 13-18, Lodgment No. 7 at 35.) Accordingly, this Court reviews the claim on the merits.

14

facts for this claim:

> The court instructed the jury on voluntary manslaughter based on heat of passion by giving CALCRIM No. 570.  The court's instruction stated in relevant part:
>
>> "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment*." (CALCRIM No. 570, italics added.)
>
> During her closing argument, the prosecutor discussed the heat of passion form of voluntary manslaughter and what constituted sufficient provocation.  She then made the following statements that Jennifer now claims, for the first time, misstated the law regarding provocation:
>
>> "You decide whether the provocation was sufficient.
>
>> "What does [Jennifer] tell you about it?
>
>> "You decide whether a person of average disposition in the same situation, knowing the same facts, knowing the same circumstances, would that person, that average person, have *reacted in the same manner* from passion, rather than judgment[.] [¶] . . .
>
>> "Well, *would a person of average disposition kill* if under those circumstances this husband, who had been an ideal husband as described in this letter. . . . [¶] . . .
>
>> "If that were to occur where a person were to say 'Don't do it like this. Cut it that way,'" laugh, get up.  Get up off that bed.  Get out of that room.  Get out of that condo and leave that marriage. Walk out.  Go.
>
>> "But stab a man in the head, in the chest, in the back nine times for that?  Is that sufficient provocation?  *Is that sufficient reason to kill?*" (Italics added.)
>
> Shortly thereafter, the prosecutor argued, "Again, the defendant cannot set her own standard.  It has to be how a person of average disposition *would react*." (Italics added.)

(Doc. No. 13-18, Lodgment No. 7 at 33–34.)  On appeal, Petitioner argued, and the Government conceded, that the prosecutor misstated the law on provocation at closing

15-cv-00924-H-BLM

argument.  (Doc. No. 13-18, Lodgment No. 7 at 36.)  Under California law, the proper standard for finding sufficient provocation to reduce an unlawful killing from murder to manslaughter is not whether an ordinary person of average disposition would kill under the circumstances, but whether such a person would react from passion rather than from judgment under the circumstances.  See People v. Beltran, 56 Cal. 4th 935, 942, 949 (2013).  As a result, the prosecutor misstated the standard by asking the jury to decide whether a person of average disposition would "have reacted in the same manner" or would "kill" under the same circumstances.  (Doc. No. 13-18, Lodgment No. 7 at 33.)

Nonetheless, the California Court of Appeal determined that the prosecutor's misstatement of the law did not warrant reversal of Petitioner's conviction.  (Id. at 37.)  The Court of Appeal noted that the trial court instructed the jury with CALCRIM No. 570, which is consistent with Beltran's standard for provocation.  See 56 Cal. 4th at 954 n.14.  (Id. at 33.)  The Court of Appeal also noted that the trial court instructed the jury to follow the court's instructions if the attorneys' comments on the law conflicted with the court's instructions.  (Doc. No. 13-18, Lodgment No. 7 at 37.)  The Court of Appeal presumed that the jury understood the trial court's instructions and followed the proper standard set forth in CALCRIM No. 570, citing People v. Hinton, 37 Cal. 4th 839, 871 (2006).  (Id. at 38.)  Accordingly, the Court of Appeal found the prosecutorial error harmless because Petitioner failed to show "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (Doc. No. 13-18, Lodgment No. 7 at 37.)

**A. Standard of Review**

A prosecutor's improper or incorrect statements during a trial constitute a due process violation only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Parker, 132 S. Ct. at 2153 (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)).  In determining whether a due process violation

occurred, the court must examine the misconduct in the context of the entire proceedings. See Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  Moreover, under AEDPA's highly deferential view, a federal habeas court may not grant habeas relief unless the state court's harmless error determination is so unreasonable that no fairminded jurist could agree with it.  See Ayala, 135 S. Ct. at 2199.

**B. Analysis**

Under AEDPA's deferential standard, Petitioner's first claim fails because the California Court of Appeal's harmless error determination was objectively reasonable. Clearly established Supreme Court precedent provides for a presumption that jurors follow a trial court's instructions and disregard the prosecutor's arguments to the extent they are inconsistent.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); Boyde v. California, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument . . . and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law.  Arguments of counsel which misstate the law are subject to objection and to correction by the court.").

Here, the trial court properly instructed the jury to follow CALCRIM No. 570, which sets forth the correct standard to evaluate provocation. (Doc. No. 13-18, Lodgment No. 7 at 37.)  The trial court also instructed the jury under CALCRIM No. 200 to follow the law as the court explained it and to follow the court's instructions if the attorney's comments on the law conflict with the court's instructions.  (Id.)  Further, there is nothing in the record showing that the jurors failed to follow the trial court's instructions.  Therefore, the California Court of Appeal's determination that the jury followed the trial court's instructions, ignored the prosecutor's misstatements, and applied the correct standard for provocation was a reasonable application of clearly established Supreme Court precedent

1    and a reasonable determination of the facts in light of the evidence in the record.

2    Accordingly, the Court denies this claim on the merits.

3    **III.    Petitioner's Admission of Evidence Claim**

4         In ground two, Petitioner argues that the trial court violated her due process rights

5    by erroneously admitting evidence of her affair with Orvill Webb.  (Doc. No. 1 at 7.)

6    Petitioner argues that this evidence should not have been admitted because it was irrelevant

7    and any probative value of the evidence was outweighed by its prejudicial impact. (Id.;

8    Doc. No. 14 at 6.)

9         This Court again looks to the California Court of Appeal's reasoned decision.  See

10   Brumfield, 135 S. Ct. at 2276.  Petitioner filed a motion in limine and renewed the objection

11   at trial seeking to exclude evidence of her affair with Webb that ended around 2005 as

12   irrelevant and prejudicial, but also argued that evidence of Dr. Trayers's first affair with

13   Danielle Merket in 2007 should be admitted as it related to her state of mind at the time of

14   the killing.  (Doc. No. 13-18, Lodgment No. 7 at 14–16; Doc. No. 13-10, Lodgment No.

15   2-1 at 46–49.)  The trial court ruled on both occasions to admit the evidence of Petitioner's

16   affair with Webb because it was relevant for the jury to understand the true state of

17   Petitioner's marriage and "what the emotions were and what Jennifer was feeling on

18   December 4 when she killed Dr. Trayers."  (Doc. No. 13-18, Lodgment No. 7 at 17.)

19        In rejecting Petitioner's claim, the California Court of Appeal concluded that the

20   trial court appropriately exercised its discretion in admitting the evidence, and that the

21   admission of the evidence did not violate Petitioner's due process rights.  (Id. at 20, 23.)

22   The Court of Appeal reasoned that "[Petitioner] placed at issue the state of her marriage

23   with Dr. Trayers, and thus her motive in killing him, by arguing that evidence of Dr.

24   Trayers's first affair—with Merket before she had her own affair with Webb—was relevant

25   to her state of mind at the time she killed Dr. Trayers.  Webb's testimony about his affair

26   with [Petitioner] while she was married to Dr. Trayers was relevant to both the state of her

27

28

marital relationship with Dr. Trayers and her motive at the time she killed him." (Id. at 21.) Furthermore, "Jennifer portrayed herself in the eight-page email she sent to Robins as a wife who had been dedicated to Dr. Trayers over the years and had sacrificed for him despite his two extramarital affairs. Webb's testimony that [Petitioner] had her own affair with him undermined her self-portrayal in that letter and had some tendency in reason to call her credibility into question." (Id. at 21–22.) Finally, the Court of Appeal rejected Petitioner's contention that the evidence was unduly prejudicial because Webb's testimony was short and did not uniquely evoke an emotional bias against Petitioner as an individual with very little effect on the issues. (Id. at 22.)

**A. Standard of Review**

"[F]ederal habeas corpus relief does not lie for errors of state law." Estelle, 502 U.S. at 67 (internal quotation marks omitted). Therefore, a petitioner is not entitled to habeas relief based on a claim that the trial court violated a state evidentiary rule. See id.; see also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief."). Rather, to establish entitlement to habeas relief, a petitioner must show that the trial court's evidentiary ruling constituted a violation of constitutional rights. See Estelle, 502 U.S. at 67–68; see also Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999) ("Even where it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial.").

The erroneous admission of evidence violates due process only where the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." Dowling v. United States, 493 U.S. 342, 352 (1990). The admission of evidence that is relevant to an issue in a case does not violate the Due Process Clause. See Estelle, 502 U.S. at 69–70 (finding no due process violation where evidence was relevant to an issue in

15-cv-00924-H-BLM

1    the case).

2    **B. Analysis**

3    The California Court of Appeal's determination that the admission of evidence of

4    Petitioner's affair did not violate due process was a reasonable application of clearly

5    established Supreme Court precedent.  Webb's testimony about Petitioner's affair was

6    relevant to Petitioner's credibility, in particular Petitioner's portrayal of her marriage with

7    the victim.  It was also relevant to understanding her state of mind when she killed Dr.

8    Trayers and evaluating how Dr. Trayer's affair with Robbins affected her. Because the

9    evidence in question was relevant to issues in the case, the trial court's admission of the

10    evidence was not so fundamentally unfair as to violate due process.  See Estelle, 502 U.S.

11    at 69–70.  As a result, the Court rejects Petitioner's second claim on the merits.

12    **IV.    Petitioner's Insufficiency of Evidence Claim**

13    Finally, Petitioner challenges her conviction of second degree murder on the ground

14    that the evidence presented at trial was insufficient to support a finding of anything greater

15    than voluntary manslaughter. (Doc. No. 1 at 8.) She argues that no reasonable juror would

16    have found that she killed her husband with malice rather than in the heat of passion.  (Id.)

17    **A. Standard of Review**

18    Jackson v. Virginia, 443 U.S. 307, 309 (1979) sets forth the standard for a federal

19    habeas court to review the sufficiency of evidence.  The Due Process Clause of the

20    Fourteenth Amendment prohibits the criminal conviction of any person except upon proof

21    of guilt beyond a reasonable doubt.  See id.  Under Jackson, a habeas petitioner challenging

22    the sufficiency of the evidence to support his state criminal conviction may obtain relief

23    only if "it is found that upon the record evidence adduced at trial no rational trier of fact

24    could have found proof of guilt beyond a reasonable doubt."  Id. at 324.  Therefore, "the

25    relevant question is whether, after viewing the evidence in the light most favorable to the

26    prosecution, any rational trier of fact could have found the essential elements of the crime

27

28

15-cv-00924-H-BLM

beyond a reasonable doubt." Id. at 319.

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam). First, on direct appeal, a reviewing court can only set aside the jury's verdict on the ground of insufficient evidence if no rational trier of fact could have agreed with the jury. See Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam). Second, on collateral review, a federal court can only overturn a state court's decision rejecting a sufficiency of the evidence challenge if the state court's decision was objectively unreasonable, but can not do so simply because the federal court disagrees with the state court. See id. The Ninth Circuit also adopts an additional degree of deference when applying Jackson's standard on sufficiency of evidence in habeas petitions. See Boyer v. Belleque, 659 F.3d 957, 964–65 (9th Cir. 2011); Juan H., 408 F.3d at 1274.

In applying Jackson's standard, federal courts must look to state law for the substantive elements of the criminal offense. See 443 U.S. at 324 n.16. Under California law, criminal homicide is divided into murder and manslaughter. Beltran, 56 Cal. 4th at 941. "Murder is the unlawful killing of a human being . . . with malice aforethought." Cal. Penal Code § 187(a). Malice may be express or implied. Id. § 188. "Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." People v. Gonzalez, 54 Cal. 4th 643, 653 (2012). Murder is further divided into first and second degree murder. See Cal. Penal Code § 189. "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder." People v. Chun, 45 Cal.4th 1172, 1181 (2009); see also Cal. Penal Code § 189.

15-cv-00924-H-BLM

On the other hand, "[m]anslaughter is the unlawful killing of a human being without malice." Cal. Penal Code § 192. Manslaughter is voluntary when the killing is "upon a sudden quarrel or heat of passion." Id. "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to [voluntary] manslaughter." Beltran, 56 Cal. 4th at 942. "The heat of passion requirement for manslaughter has both an objective and a subjective component." People v. Steele, 27 Cal. 4th 1230, 1252 (2002). The subjective component requires that the defendant "actually, subjectively, kill[ed] under the heat of passion." Id. The objective component requires that "at the time of the killing, the reason of the [defendant] was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." Beltran, 56 Cal. 4th at 942 (internal quotation marks omitted).

## B. Analysis

Petitioner argues that there is insufficient evidence to support her conviction of second degree murder. (Doc. No. 1.) Petitioner contends that based on the trial evidence, no reasonable trier of fact would find that the killing resulted from malice rather than heat of passion. (Id.) In conducting habeas review, this Court looks to the substantive requirements of California state law and evaluates the objective reasonableness of the California Court of Appeal's sufficiency of the evidence determination under Jackson. See 443 U.S. at 319, 324 n.16. Thus, for Petitioner to prevail on her claim, the evidence in the record must be such that no reasonable trier of fact could find that Petitioner killed her husband with malice and that the provocation did not satisfy the heat of passion standard.

First, the California Court of Appeal concluded that a reasonable juror could find beyond a reasonable doubt that Petitioner killed Dr. Trayers either intentionally or by acting with a conscious disregard for his life while knowing she was endangering his life. (Doc. No. 13-18, Lodgment No. 7 at 27.) The Court of Appeal relied on Petitioner's own

22

testimony establishing that she aimed the first stabbing wound to the part of Dr. Trayers's neck that showed skin:

> Specifically, Jennifer testified she stabbed him "the first time" with military knife "in the back of the neck." Her trial counsel then asked her, "Did you aim for the back of his neck or head, or did that just happen that way?" Jennifer replied, "It was the first place I saw skin." Her counsel then asked her, "And when you say that was the first place you saw skin, were you *aiming* for a part of his body that had skin showing?" Jennifer answered, "Yes."

(Id.) "In addition, undisputed medical expert testimony established that Jenifer stabbed Dr. Trayers numerous times in vital parts of his body, including twice in the chest and eight times in the back." (Id.) Dr. Trayers's blood splatter and slashes on the pillows, sheets, and mattress on his side of the bed were consistent with Dr. Trayer's having been stabbed while he was lying on the bed under the bedding, and contradicted Petitioner's testimony that Dr. Trayers stood up and pulled off the bedding. (Id. at 5–6, 14.) The multiple incised wounds to Dr. Trayers's hands were consistent with defensive wounds where he was attempting to block or grab the knife to defend himself. (Id. at 5.) Most of Petitioner's wounds were superficial, and medical experts opined that those wounds were self-inflicted. (Id. at 4–5.) Finally, Petitioner testified that she was not under the effects of the sleeping aid at the time of the stabbing. (Id. at 13.) Based on the evidence, a rational trier of fact could find beyond a reasonable doubt that Petitioner intentionally aimed her first knife strike at the back of Dr. Trayers's neck, and she also intentionally inflicted the subsequent knife strikes while Dr. Trayers was lying in bed. (Id. at 27, 29.)

Furthermore, the California Court of Appeal concluded that the provocation at the time of the killing was not sufficient as would cause a reasonable person to act rashly and without deliberation and reflection. See Beltran, 56 Cal. 4th at 942. (Id. at 30.) Petitioner learned about Dr. Trayers's affair with Robins almost two months before the day of the killing. (Doc. No. 13-18, Lodgment No. 7 at 9–10.) Petitioner claimed that Dr. Trayers laughed at her when she poked her wrist with the butcher knife. (Id. at 12.) The jury was

not required to find this testimony credible. But, even assuming this testimony was credible, a reasonable juror could conclude that Dr. Trayer's response to Petitioner's escalating behavior was not sufficiently provocative as to cause a reasonable person under the circumstances to lose reason and judgment. (Id. at 31–32.) Accordingly, the Court of Appeal concluded that the evidence is sufficient to support the finding that Petitioner "acted with malice when she fatally stabbed Dr. Trayers, and that Dr. Trayers's conduct was not sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (Id. at 26, internal quotation marks omitted.)

Affording due respect to the fact-finding role of the jury and the state court's judgment, this Court concludes that the evidence at Petitioner's trial is sufficient to establish malice in the killing of Dr. Trayers. See Beltran, 56 Cal. 4th at 942. On the basis of the trial evidence, a rational jury could infer that Petitioner intentionally inflicted multiple knife wounds aimed at Dr. Trayers's neck and vital organs, and that she was not sufficiently provoked to act out of passion rather than judgment at the time of the killing. As a result, this Court concludes that there is sufficient evidence as required by due process to support Petitioner's conviction, and that the California Court of Appeal decision is a reasonable application of the Jackson standard. Accordingly, the Court denies Petitioner's claim on the merits.

## V.    Certificate of Appealability

A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court has denied the petitioner's constitutional claims on the merits, the petitioner satisfies the above requirement by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). The Court concludes that reasonable jurists would not find the

15-cv-00924-H-BLM

Court's assessment of Petitioner's claims debatable or wrong.  Accordingly, the Court declines to issue a certificate of appealability.

<u>**Conclusion**</u>

For the foregoing reasons, the Court denies Petitioner's petition for a writ of habeas corpus and adopts the magistrate judge's report and recommendation.  (Doc. Nos. 1, 15.) Additionally, the Court denies Petitioner a certificate of appealability.

**IT IS SO ORDERED.**

DATED: August 1, 2016

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

25

15-cv-00924-H-BLM